## Pioneer Commercial Funding Corp. v. American Financial Mortgage Corp.

32

C.P. of Philadelphia County, April Term, 1998, no. 0885.

*Maurice R. Mitts,* for plaintiff.

*David R. Moffitt,* for defendants American Financial Mortgage Corp. and Flatley.

*Michael M. Baylson, Nolan N. Atkinson Jr., Hon. Arlin M. Adams* and *Ralph G. Wellington,* for defendant First Union/CoreStates.

COHEN, *J.,* December 4, 2000—The court has before it the post-verdict motions of defendant CoreStates Bank NA., as well as post-verdict motions of defendants American Financial Mortgage Corporation, Thomas F. Flatley, and plaintiff Pioneer Commercial Funding Corporation which were filed in the aftermath of a long, bitterly contested trial. Testimony in this matter began on June 2, 2000. The jury returned a verdict on July 26,

2000. The jury awarded the plaintiff, Pioneer Commercial Funding Corporation, $13.5 million in consequential damages and $337.5 million in punitive damages against the bank. This was a bifurcated trial. After the liability phase, concluding June 30, 2000, the jury found that defendants CoreStates and American Financial Mortgage Corporation were liable in conversion to the plaintiff, Pioneer, in the amount of $1,779,519.99. The court directed a verdict on a contract claim against defendants American Financial Mortage Corporation and Thomas Flatley.

After reviewing the post-verdict motions filed by all defendants, reviewing their briefs and memoranda, and after hearing argument, this court by means of the within appropriate orders will deny judgment n.o.v. in favor of AFMC on the conversion claim, deny judgment n.o.v in favor of both AFMC and Flatley on the contract claim, affirm the jury's award against CoreStates as it pertains to its liability in conversion and consequential damages, and, furthermore, grant CoreStates' motion for remittitur. Pursuant to the remittitur, the court will set punitive damages at $40,500,000, which amount plaintiff is to accept or, in the absence of its acceptance, be subject to a new trial on the sole issue of punitive damages.

The court hereby denies the post-verdict motions of defendants on every other ground cited. Finally, the court will grant Pioneer's request to recover attorneys' fees, costs and interest at the contract rate from AFMC and Flatley and the plaintiff's request to recover prejudgment interest from CoreStates Bank. Plaintiff's request to otherwise mold the verdict is denied.

## FACTUAL BACKGROUND

The plaintiff in this matter alleged, and the jury agreed, that until the late fall of 1997 it was a thriving mortgage funding company with a bright future. In November 1997, however, Pioneer innocently fell victim to the unfounded assertion of CoreStates Bank of its common-law right of setoff. Unbeknownst to Pioneer, its partner in a loan and security agreement, AFMC, through its principal, Thomas Flatley, was caused to be overdrawn in checking accounts it maintained at CoreStates in excess of $4 million with the tacit complicity of the bank. On November 6, 1997, upon discovery of its loss due to the "check kiting" scheme, CoreStates imposed a debit restraint on all the accounts of AFMC and its affiliates. On November 25, 1997, AFMC, through its lawyer, notified the bank and provided proof that an affiliate in a mortage loan transaction, Norwest, had wrongly and mistakenly deposited into AFMC's settlement account at CoreStates some $1.7 million.[1]

Despite this notification, CoreStates, in a desperate attempt to recoup its negligently incurred losses, seized the funds pursuant to its alleged right of setoff. Instead of contesting the seizure, AFMC and Thomas Flatley entered into a workout agreement with the bank whereby the parties conspired to keep Pioneer's money and to

---

1. This is the way the transaction broke down: On November 12, 1997, Norwest wired $1,454,699.80 into AFMC's account; on November 13 Norwest wired $209,984.33, and on November 19, 1997, Norwest wired $114,835.86 into the CoreStates account owned by AFMC. (See N.T. 6/6/00 a.m. pp. 45-56; 6/15/00 a.m. pp. 33-36; and supporting exhibits T-723 and T-5005.) Thus, the total amount wired into AFMC's account at CoreStates was $1,779,519.99.

keep the matter secret. The resulting effect was the severe impairment of capital and business credibility of plaintiff. It ceased operations and went out of business.

To quote directly from the capable brief filed with this court by CoreStates, "There is no dispute that AFMC owed money to both Pioneer and CoreStates." (See brief of defendant CoreStates at p. 3.) That is the watershed question. In the view of Pioneer, supported by this jury's verdict, Pioneer enjoyed the exclusive right of ownership in the sums that Norwest mistakenly wired into AFMC's account. It is the contention of CoreStates that the long and respected common-law right of setoff vested in CoreStates' ownership rights to any amounts of money it found in any account of AFMC's at any time after the imposition of the November 6 debit restraint.

The court first addresses the contentions of defendant CoreStates, followed by those of defendants AFMC and Flatley and plaintiff Pioneer.

## I. *Judgment n.o.v.—Legal Issues*

### (A) Whose Money Was It, Anyway?

In order to determine who owned the funds at issue the court believes that the determinative testimony was that of Melanie Holtz, senior vice president of RNG; Glenda Klein of Pioneer; Howard Seidman, executive vice president of AFMC; and Joseph Scheuren, vice president of AFMC. Collectively, the four testified that Norwest committed to purchase two portfolios. Exhibits T-138 and T-146 evidence the first portfolio and T-143 and T-147 evidence the second portfolio. It was

Melanie Holtz and Glenda Klein who discovered that Norwest mistakenly wired payment for the first portfolio to AFMC's settlement account at CoreStates. It is critical to understanding the history of this transaction to note that Norwest's first mistake was reversed within hours and the money representing the first portfolio was deposited in Pioneer's account at Banc One, as it should have been.

After the experience of the first group of loans, Holtz, Klein and Seidman all contacted Norwest to insure that a second mistaken deposit would not occur. Holtz sent Norwest specific instructions directing it how to wire the money. These instructions were signed by Howard Seidman. (See N.T. 6/12/00 p.m. pp. 94-96.) Moreover, Holtz called a Dana Gibbs at Norwest to further ensure that Ms. Gibbs received the wiring instructions. Ms. Gibbs assured Ms. Holtz that Norwest would honor the instructions. (*Id.* at 96.) According to Melanie Holtz, she took these special precautions "as soon as I found out the first wire did not go to Banc One." (*Id.* at 97.)

CoreStates strenuously argues that Pioneer was mistaken in its contention that AFMC never owned the monies that were taken by means of setoff because AFMC never acquired any interest in the loan packages of RNG, a loan originator, which has filed in bankruptcy. In support of this argument, CoreStates underscores that the loans endorsed to AFMC were without conditions and in turn endorsed by AFMC to Norwest "unconditionally" without identifying Pioneer's security interest. CoreStates further cites the parol evidence rule for the proposition that the documents at issue must speak for themselves and the actions of the parties surrounding

the transactions have no effect on the ultimate factual determination of who owned the contested funds.

Pioneer did, indeed, own the notes as the jury so held. This was certainly the understanding of the parties as emphasized by the testimony of Howard Seidman. (N.T. 6/13/00 p.m. pp. 45-51; 85-91.) Testimony by Glenda Klein and Melanie Holtz also illuminates the nature of the transaction at issue.

### 1. *The significance of the parol evidence rule*

The Supreme Court of Pennsylvania defines the parol evidence rule as follows:

"Where the alleged prior or contemporaneous oral representations or agreements concern a subject which is specifically dealt with within the written contract, and the written contract covers or purports to cover the entire agreement of the parties, the law is now clearly and well settled that in the absence of fraud, accident or mistake, the alleged oral representations or agreements are merged in or superseded by the subsequent written contract, and parol evidence to vary, modify or supersede the written contract is inadmissible in evidence."

This court specifically holds that the parol evidence rule is inapplicable to the sale of loans under review. The parol evidence rule enters the picture when the central player in the contractual drama is a completely integrated agreement. It is abundantly clear that no single agreement governs the relationships among the parties in this setting. See *McGuire v. Schneider Inc.,* 368 Pa. Super. 344, 349-50, 534 A.2d 115, 118 (1987).

## 2. *Other indicia of ownership*

The record in this case is heavy with testimonial and demonstrative evidence tending to show by a strong preponderance that Pioneer owned the notes and the proceeds involved in the AFMC/Norwest/RNG transactions. In addition to the testimony already cited, the jury saw the bailee letter attached to the notes. These letters express the ownership, interest of Pioneer and Banc One in the notes and proceeds, which the court, and obviously the jury, believed to be clear and irrefutable proof of ownership of the funds. Furthermore, on November 25, 1997, AFMC's attorney, David Moffitt, a lawyer in a greatly respected firm, wrote a letter to CoreStates requesting that it return the funds so that they may be sent *"to the intended recipient of the wires, Pioneer Bank."* (emphasis supplied) The jury saw this letter at T-1000 and could not ignore it. The jury's finding that the loan proceeds were the property of Pioneer is supported by the evidence. CoreStates' motion for post-verdict relief on this issue, *i.e.,* ownership of the loan proceeds, is denied.

## (B) The Significance of Regulation J

CoreStates further maintains that because the funds at issue were directed to the settlement account of AFMC at CoreStates by means of a federal wire transfer, the plaintiff's claims are controlled by article 4(a) of the Uniform Commercial Code, 13 Pa.C.S. §4(a)101 et seq. and Federal Reserve Board regulation J, 12 C.F.R. part 210. Citing the foregoing provisions, CoreStates argues that its setoff of Pioneer's money from AFMC's settle-

ment account to satisfy AFMC's overdrafts could not constitute conversion because such a setoff was specifically authorized under the applicable provisions of the UCC. In support of its argument, CoreStates most strenuously cites two federal district court cases (which are not and never have been binding on this court), viz *Community Bank F.S.B. v. Stephens Financial Corporation*, 966 F. Supp. 775 (N.D.Ind. 1997) and *Cumis Ins. Soc'y Inc. v Citibank N.A.*, 921 F. Supp. 1100, 1109-10 (S.D.N.Y. 1996). Both cases seem to hold that regulation J, in that it is federal law, pre-empts the common-law claim of conversion, which is the plaintiff's theory of recovery in this case. However, this court finds that the cited cases do not and never did apply to the scenario that was before the jury. While the factual situation in *Community Bank* may be somewhat similar to the set of facts at hand, there are obvious differences which mandate the opposite result. In *Community Bank*, a debtor owed money to a finance company. The finance company told the debtor to wire the funds it was owed to its warehouse lender, Chase Manhattan Bank. Instead, the debtor wired the funds to another bank, to which the debtor's creditor owed money. Hence, the other bank set off the amount that it was owed before returning the excess to the debtor. In the meantime, the debtor had paid another amount of money to the correct bank. Hence, the debtor wanted its money that was wrongfully deposited and setoff returned.

In *Community Bank,* the court did indeed hold that article 4(a) of the Uniform Commercial Code as the Pennsylvania statutory embodiment of regulation J pre-empted the common-law action by the debtor but only after ad-

dressing four questions that seem to open up the common-law action: (1) was the wire transfer an authorized payment as defined by the UCC; (2) which party owned the funds at the time of setoff; (3) was the debtor's attempt to cancel binding on the bank that performed the setoff; and (4) was the setoff appropriate under the applicable law? See *Community Bank,* 966 F. Supp. at 781.

In citing *Community Bank,* the defendant attempts to compare the orange of that case with the apple of the facts under the current case. This court has already explained that the ownership interest on the part of Pioneer had been fully established by the time CoreStates exercised its setoff—December 18, 1997.

Looking also at the *Cumis* case, the court finds that the defendants are attempting to fit a different set of facts into the instant framework. In *Cumis*, an *imposter* caused the fraudulent wiring of money from an account at Benchmark in West Chester, Pennsylvania, to an account at Citibank in New York. The same imposter, 13 days later, deposited a forged treasury check into the account of Mario Adler at Benchmark. Four days after that deposit, the imposter called Benchmark seeking to transfer more money to the Citibank account. Benchmark tried to get the wrongly deposited money back in a series of wires it sent via CoreStates. Meanwhile, the holder of the account at Citibank had withdrawn the money necessary to cover the fraudulent transfers. The plaintiff was Benchmark's insurer. After paying Benchmark the amount of money it lost, the plaintiff insurer sued Citibank. The plaintiff alleged fraud because an agent of Citibank had told CoreStates when it tried to reclaim the money that the money previously transferred had been

withdrawn and that was not so. Or, as the court put it, Citibank's representative told Benchmark (CoreStates) "There was nothing [it] could do to recover the money—essentially, don't bother, the money's gone." 921 F. Supp. at 1103. The court upheld the plaintiff's argument that the allegedly false statement could be the basis of fraud. *Id.*

The court in *Cumis* then delves into the question whether Benchmark relies on Citibank's erroneous statement in refraining from resending a telex requesting the return of wire transfers as a "tested telex with an indemnification" causing it to forego other means by which it could have secured the return of the funds. Citibank replied that it had no obligation to return the wire transfer funds to Benchmark.

In *Cumis*, the effect of article 4(a) of the UCC is to characterize Citibank as a receiving bank which had an obligation to pay funds over to a beneficiary. It could have returned the funds or not returned the funds at its discretion. However, as the court points out, the commentary to the UCC section does not relieve the bank from liability. See 921 F. Supp. at 1105. The defendant relies on *Cumis* for the proposition that in circumstances such as those that were before the jury in this case, UCC article 4(a) has a wide and exclusive reach. However, the facts in *Cumis* differ immensely from the facts in the current case. In *Cumis*, the plaintiff could not allege that there was any agreement to return the funds. See 921 F. Supp. at 1110. In the current matter, there was an *understanding* among the parties that the funds did not belong to AFMC. There was sufficient communication among

the parties for defendant to know—and the jury so held— that the money at issue belonged to Pioneer.[2]

The defendants' motion for a new trial and/or judgment n.o.v. on the foregoing ground is therefore denied.

## (C) Significance of the Bankruptcy

The defendant argues that because RNG was in bankruptcy at the time Pioneer funded the mortgage loans at issue, and although the loan and security agreement between RNG and Pioneer predated the bankruptcy and granted a continuing lien and security interest to Pioneer in all of RNG's existing and after-acquired mortgage loans, the United States Bankruptcy Code at §552 "cut off the effect of that security agreement." (See brief of defendant at p. 4.) Accordingly, the defendant argues that without bankruptcy court approval of the security interest, Pioneer can assert no property interest in the loan proceeds.

The court finds the Bankruptcy Code inapplicable. As the plaintiff points out in its brief, Pioneer took title to the notes through what the plaintiff calls "an absolute assignment" of the notes from RNG in the ordinary course of business. The court further holds that there was sufficient indicia, *e.g.* the bailee letters T-146, T-147, of ownership on Pioneer's part. The plaintiffs correctly

---

2. The court notes with interest that the defendant refrained from addressing the tangled facts in the *Cumis* case in its brief. However, the court holds the defendant blameless because, other than setting forth a circumstance in which the UCC provision applies, the *Cumis* case features a widely disparate set of facts and does not squarely deal with a setoff.

characterize this ownership interest as a "perfected security interest" vesting rights independently in Pioneer.

Defendant's motion for post-verdict relief on the foregoing ground is therefore denied.

### (D) Section 606 of the Banking Code

CoreStates argues that the jury's verdict was contrary to law because as a predicate to preventing setoff or debit restraint by the bank, section 606 of the Pennsylvania Banking Code and the Uniform Commercial Code required Pioneer to obtain a court order or post a bond.

In support of its position the bank cites *E.F. Houghton & Co. v. Doe*, 427 Pa. Super. 303, 628 A.2d 1172 (1993). In *Houghton,* an investment clerk employed by the plaintiff stole from it a million dollars in treasury notes and deposited them in two accounts at Mellon (then Girard) Bank. The dishonest employee then used these funds as collateral to obtain a $150,000 loan from the bank. The loan agreement provided that in the event of default the bank was entitled to withdraw $150,000 plus accrued interest from the account of the dishonest employee to pay the debt. 427 Pa. Super. at 305, 628 A.2d at 1173. The thieving employee's employer discovered the theft, sued the employee and his wife and obtained a judgment against them. Before it received a writ of attachment directed to the funds, Mellon exercised its rights under the loan agreement and withdrew the stated principal and interest from the account. It is unquestionable that the account holders owed Mellon the required amount. Further, Mellon paid the thief's employer the balance.

In turning down the employer's request for the balance of the stolen money, the Superior Court follows the literal language of the Banking Code. 7 Pa.C.S. §606. The cited section indeed requires that a party asserting an interest in funds: "(i) obtain and serve on the institution an appropriate order directed to the institution by a court restraining any action with respect to the account or property until further order of such court or instructing the institution to pay the balance of the account or deliver the property in whole or in part as provided by the order or (ii) deliver to the institution a bond in form and amount and with surety satisfactory to the institution, indemnifying the institution against any liability, loss or expense which it might incur because of its recognition of the adverse claim . . . ."

The very well-reasoned opinion of Judge Beck in *Houghton* sharply distinguishes the facts of this case from the facts therein. The court states:

"Cases which prohibit setoff by the bank are inapplicable to the circumstances of this appeal. *This appeal does not involve deposit funds held for the benefit of a third party in a trust, fiduciary or agency context.*" 427 Pa. Super. at 309, 628 A.2d at 1175-76 citing *Sherts v. Fulton Nat'l Bank*, 342 Pa. 337, 21 A.2d 18 (1941) and *Ryan Brothers Inc. v. Curwensville State Bank*, 382 Pa. 248, 114 A.2d 178 (1955).

And there is no question that under the facts of the current case, as in *Sherts*, the funds that AFMC held in trust for another under a fiduciary or agency relationship were not available to the bank for payment of debts owed by the individual debtor who happened to be the account holder in this case. See *Houghton*, 427 Pa. Su-

per. at 309-10, 628 A.2d at 1175-76.[3] Because section 606 of the Banking Code does not apply to the underlying transaction herein, the court will deny CoreStates' petition for post-verdict relief on this ground as well.[4]

3. Any doubt as to whether the funds at issue in this case were held in trust should be resolved with reference to the so-called Moffitt letter, T-1000. On November 25, 1997, David Moffitt, Esquire, attorney for AFMC, wrote to CoreStates to inform them that the funds wired into the settlement belonged to Pioneer. Moffitt enclosed a copy of the bailee letter and specifically requested that the bank undo the wires. The bailee letter says:

"The enclosed notes . . . and other documents ("collateral") . . . have been assigned and pledged to (a) Pioneer Commercial Funding Corp., ("borrower") as collateral under a loan and security agreement . . . . The collateral is being delivered to you for a purchase under the existing take out commitment . . . . Either payment in full for the collateral or the collateral itself must be received within 45 days after the date of this letter. Until the time you are deemed to be holding the collateral in trust, subject to the security interest granted first to borrower and then to agent for lenders and as agent's bailee in accordance with the applicable provisions of the Uniform Commercial Code . . . . Payment for collateral must be made by wire transfer or immediately available funds to: Banc One, Texas N.A., agent account . . . credit: Pioneer Commercial Funding Corp . . . ."

Banc One's representative, Gloria Sadler, testified that the aforesaid bailee letter accompanied the notes when they left Banc One and were shipped to AFMC. See N.T. 6/7/00 p.m. pp. 74, 85.

4. The court further holds that section 9306 of the Pennsylvania UCC, 13 Pa.C.S. §9306(b), is inapplicable to the current facts because of the foregoing analysis, viz that AFMC was in a fiduciary relationship to Pioneer. Further, the argument that CoreStates advances in support of the proposition that Pioneer, pursuant to the foregoing section of the UCC never had a security interest, emerged during a colloquy concerning a proposed point for charge. (See N.T. 6/29/00 p.m., pp. 94-98.) But the thrust of that argument was that the court was required in the defendant's view to charge the jury in the words of the UCC. This court adequately instructed the jury on the elements of a security interest by means of its charge without following the language of the UCC.

## II. *New Trial Issues*

### (E) The Court's Instruction on Liability Was Correct

Defendant CoreStates requests that this court order a new trial holding that it erred as a matter of law in instructing the jury on "liability." CoreStates states: "The court's charge was confusing." Initially, CoreStates contends that the court should have explained what the defendant considers to be the applicable provisions of the Uniform Commercial Code, Federal Banking Regulation J, the United States Bankruptcy Code and the Pennsylvania Banking Code to the jury. However, the court has held herein, and previously held as a matter of law, that these provisions do not apply to the events that gave rise to this lawsuit.

The Supreme Court of Pennsylvania held in *Stewart v. Motts,* 539 Pa. 596, 654 A.2d 535 (1995) that "Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue." 539 Pa. at 606, 654 A.2d at 540, citing *Glider v. Commonwealth, Department of Highways,* 435 Pa. 140, 151-52, 255 A.2d 542, 547 (1969). The court further held that a new trial is in order on the basis of an inadequate charge if the charge under review fails to make the issues clear to the jury or if there was a "prejudicial omission of something basic or fundamental." *Id.* In order to determine whether there was such an omission or whether the charge was misleading or in some sense prejudicial, the reviewing courts look at the charge "as a whole."

This court, upon review of its own charge, holds that no issue was omitted and that the charge as a whole adequately instructed the jury.

In addition to its repeated contention that the foregoing statutory and regulatory provisions somehow should have been incorporated into the charge—a contention that the court has repudiated—the defendant further complains that this court failed to tell the jury that its actions would have freed it of liability had the jury found that it acted in good faith. To paraphrase the Supreme court in *Stewart*, while words such as "good faith" and "high degree of care" have their champions among lawyers they have no "talismanic properties" requiring that they always be used in instructing the jury in cases of this description. The inquiry is not whether this court used the precise words that the defendant wanted it to use, but whether it adequately guided the jury in carrying out its task of weighing the facts in accordance with the law. *Id.* The court spelled out the elements of conversion, and in noting that CoreStates and AFMC had the right to rely on the advice of counsel in taking the actions that they did, placed the good faith defense before the jury. Accordingly the defendant's request for a new trial on this ground will be denied.[5]

---

5. Elsewhere in the defendant's brief, CoreStates takes issue with this court instruction on causation where it applies to the plaintiff's burden of proof. The defendant believes the court erred by telling the jury that the setoff had to be a "significant factor" in causing the business harm to Pioneer rather than a substantial factor. The plaintiff, however, is correct in pointing out that: (1) the courts permit significant to be used in place of substantial (see *Jeter v. Owens Corning Fiberglas Corp.*, 716 A.2d 633, 636 (Pa. Super. 1998)) and (2) the court used adjectives significant and substantial interchangeably and on the record (see N.T. 7/26/00 p.m. pp. 82-83).

## (F) The Fairness of the Proceedings

CoreStates demands a new trial "in the interest of justice" citing a "fundamental lack of fairness in the proceedings." In support of this claim, the defendant spells out the following grounds:

"(1) The trial was unfair because plaintiff was permitted to expand its scope on the eve of trial and CoreStates' defense was then hampered by its late need to change counsel and preclusion of the testimony of its lawyer and chief witness.

"(2) The trial was unfair because Pioneer was allowed to present an unpleaded 'conspiracy theory' under which inflammatory and inadmissible evidence was admitted against CoreStates.

"(3) The trial was unfair because erroneous trial rulings prevented CoreStates from adequately presenting its case.

"(4) The trial was unfair because the trial judge refused to recuse himself.

"(5) The trial was unfair because of the improper conduct of Pioneer's counsel before the jury."

The court will deal with these contentions in order of their presentation.

Preliminarily, the court must observe that trial of this matter, the outcome of which was of critical interest to all parties, turned out to be a highly contentious affair. Nonetheless, amidst the exchange of objections, barbs, and ex cathedra comments, the parties were able to present the jury with respectively clear versions of their positions. The court cannot find fault with the comprehensive state of preparation and generally professional conduct of all attorneys involved in this case.

### 1. *Were the sides lined up unequally at the starting gate?*

#### (a) Pretrial rulings: discovery proceedings

Buried in footnote 18 on page 18 of CoreStates' brief is the following statement: "Discovery was contentious and hindsight demonstrates that it would have been prudent for CoreStates to have handled some of those issues in another way." Indeed. As CoreStates inferentially concedes, the contentious atmosphere that pervaded trial of this case flowed from the contumacious response of CoreStates to the plaintiff's reasonable, if repeated, discovery requests. The nadir of this trial occurred on June 28, 2000, when the bank produced a parcel of probative documents it clearly had at its disposal for years. On that day, both CoreStates' prior counsel, Walter Weir, Esquire, and its incumbent trial counsel, Michael Baylson, Esquire, abashedly acknowledged that, having waived a supposed lawyer-client privilege that they believed protected these documents back on June 5, the documents still were not produced until June 28, which was, in dramatic terms, the middle of the third act of this trial. Quoth Mr. Weir: "It didn't occur to me that those documents were sitting there and hadn't been produced until yesterday." (N.T. 6/28/00 a.m. p.10.) Quoth Mr. Baylson: "I think Mr. Weir and I were under the belief that at that time we were making a full and complete production of the privileged documents. Obviously we were not . . . ." (*Id.* at 11). Mr. Baylson generously extended himself as a helpmate to the court in this matter. He said: "Not to lessen the seriousness of this, but to

mitigate its impact on the trial" that a recess would be in order to permit the plaintiff to examine the unearthed discovery. Mr. Baylson added the following gloss: "It's my opinion, having looked at them, a couple last night and this morning, that the number of substantive documents that say anything substantive are less than 20, about 20 . . . ." (*Id.* at 12.) CoreStates' counsel concluded: "I can say to your honor, I don't think there's been any bad faith or purposeful hiding here. At the most, this is an oversight." (*Id.* at 16.)

Ultimately, the court made a finding as a matter of law that "There was a misconduct on the part of the defense by failing to turn this over at the time it was supposed to have been turned over." (N.T. 6/28/00 p.m. p. 43.) The court then precluded Mr. Weir from testifying for the defense. *(Id.)* [6]

## 2. *Other indicia of unfairness*

CoreStates further complains that this court should have recused itself from these proceedings because, in effect, as the bank alleges, the court had formed a fixed opinion of CoreStates' liability in this matter and, thus, could not be fair. CoreStates bases its argument upon the affidavit of a Robert Sayre, Esquire, an associate of the aforementioned Walter Weir. Mr. Sayre's affidavit

---

6. CoreStates, in effect, characterizes the preclusion of Mr. Weir as having a devastating effect on its case. Indeed, the court's sanction was rather velvet-gloved in that Mr. Weir had already testified as of cross-examination and been directly examined comprehensively. To suggest that Mr. Weir's absence from the dramatis personae of the extensive defense presentation was a mortal blow is mystifying under the testimonial circumstances of this case.

was attached to a recusal motion the bank defendant filed prior to trial. The bank sought recusal of the court based upon rulings that did not go its way—principally, discovery matters, motions for summary judgment (in which volumes were filed while holding back discovery), and the court's hypothetical characterization which occurred during an off-the-record pretrial conference of what a jury might conclude about the conduct of the party defendants in this matter. The court did say what the defendant bank alleges it said. In an unfortunate attempt at levity the court even referred to CoreStates' successor, First Union, as "First Onion." In the latter respect, the court was behaving as Gilbert & Sullivan's "*Nisi Prius* nuisance, who just now is rather rife, the judicial humorist . . . ."[7] The court is now constrained to say in its own defense that based on its recall of the circumstances that prevailed in the spring of 2000, that its comments came purely as a response to the overly contentious behavior of the parties. During pretrial conferences on the motions for summary judgment, lawyers for all parties could not restrain themselves in hurling fusillades of accusations and abuse upon one another. This court was put in the position of a mediator and at times had to intervene in an attempt to steer the discussion back to the merits.

As to the hypothetical scenario that the court expressed, the court recalls the hypothesis came in the midst of a discovery argument during which the bank was

---

7. See "I've Got a Little List," *The Mikado, A Treasury of Gilbert & Sullivan,* Taylor, Deems (Ed.), 1941, p. 257, Simon & Schuster, New York.

strenuously urging the court to preclude T-15, the settlement agreement arrived at between AFMC and Core-States. The court's hypothesis was aimed at testing whether the disputed document would be relevant to either party under a "worst case scenario." Thus, the court views its hypothesis as no better or no worse than any "What if . . ." question hurled at an advocate by any court in any courtroom in this land. What is more, in that the expressed hypothesis and any other comment made by the court appeared nowhere in this voluminous record nor was uttered in the presence of the jury or any neutral fact-finder, the defendant has failed to prove that any comment the court might have made infected these proceedings so as to guide the ultimate outcome.

This judge is further constrained to add that he has handled over one hundred cases involving either Core-States Bank, First Union Bank or Walter Weir's law firm. An accusation of bias or prejudice is unworthy. New counsel, Judge Arlin Adams, in his brilliant argument to this court refused to raise the issue of recusal. Further, it is the duty and obligation of a diligent trial judge in a jury case to evaluate the positions of both sides of a dispute in order to encourage or effectuate settlement. In this case, the lawyers for the bank were in actuality defending their own conduct which led to the suit. In essence, they were representing themselves. Their oversensitivity is manifest and even possibly understandable.

### 3. *Was it unfair to deny a continuance?*

This defense contention can be dealt with very briefly.

CoreStates requested a continuance after it became clear that its counsel, Walter Weir, Esquire, would prin-

cipally function as a witness in this case. After consultation with the supervising judge, this court did deny the request for the continuance. Trial counsel, Mr. Baylson, entered his appearance. The trial proceeded. No prejudice resulted because nowhere during the following two months of trial did it appear plain that Mr. Baylson or his eminent co-counsel, Nolan Atkinson, Esquire, were in any way, shape or form unprepared or lacking in skill or hobbled by the comparatively brief run up to the presentation of their case.

Furthermore, again, the defendant complains too much. Mr. Weir's presence loomed large among the facts of this case from winter of 1997 to the date of trial. Mr. Weir certainly knew, for at least two months and as long as 20 months, that his role as counsel for CoreStates and the person who made critical decisions about the setoff posed a possible conflict. For CoreStates to complain that it did not anticipate the change of counsel at this point is nothing but the injection of an empty issue into its cause. Especially in view of the highly professional, well-versed and skillful performance of its replacement counsel, no error can be ascribed to this court's denial of a continuance.

### 4. *Whether the discovery abuses should have been heard by the jury*

To support its straightforward conversion claim, the plaintiff alleged that the defendants—CoreStates Bank and AFMC—found means to cover up the alienation of Pioneer's money. As a component of this theory, the plaintiff sought to prove that the workout agreement

entered into by the defendants was shaped in such a way that the act of conversion would acquire legitimacy. Accordingly, to resist proof of this theory, the defendants tried by every means possible to keep the workout agreement and all evidence associated with it out of the record. There were an unheard of seven discovery orders entered against CoreStates. Hence, there was a close correspondence between the defendant's behavior in the discovery stage of this trial and their conduct during the operative moments attendant to the conversion of Pioneer's money. It follows that Pioneer had every forensic reason to place CoreStates' erratic and resistant response to reasonable discovery requests before the jury.

CoreStates argues that this court went beyond its power to administer discovery sanctions in permitting the discovery disputes to be played out before the jury. In essence, CoreStates suggests that it would have been sufficient for the court merely to sanction it for its admitted discovery abuses and that permitting the jury to hear discovery conduct was the ultimate sanction. In support of its argument, CoreStates cites a federal district court case from the Northern District of Illinois, *Empire Gas Corp. v. American Bakeries Co.,* 646 F. Supp. 269 (N.D. Ill. 1986) holding that exclusion of evidence of pretrial discovery disputes is proper under federal law. The plaintiff and this court, however, notice that in *Empire Gas,* the court distinguishes the set of facts therein from a case in which a party "did not produce vitally important documents until the day of trial, and the responsible agent of the party was called to be cross-examined about his conduct and its relation to relevant admissible evidence." 646 F. Supp. at 274. That is what occurred dur-

ing the trial of this case. There is no question that Mr. Weir and his firm were at all times agents of defendant CoreStates in this entire operation. The court permitted evidence that CoreStates withheld discovery especially of the "midnight hour" production of critical documents by Mr. Weir and the attempt to withhold T-15 which outlined the strategy to obstruct plaintiff and have Flatley pay all of CoreStates' counsel fees as well as indemnifying them for all damages including punitives. It was also relevant for the jury to be made aware in this case as to the cost to plaintiff of pursuing this litigation in the face of such obstruction.

## 5. *Conspiracy evidence*

By means of this ground for relief, CoreStates asserts that the court wrongly allowed "co-conspirator" hearsay evidence to be entered in the record contrary to Pa.R.E. 803(25)(E) where a conspiracy was neither pleaded nor proven.

CoreStates is correct in that no conspiracy was pleaded or proven. It points to three instances in which the issue arose. On the first occasion (see N.T. 6/6/00 pp. 27-32), the lawyer for CoreStates objected to Glenda Klein's statement that defendant Thomas Flatley told her that "the money was Pioneer's." At that time, counsel timely objected and an extensive colloquy on the basis of the objection followed. The court stated that "So far I haven't heard anything about it but basically it inures to the detriment of your defendant," but expressed the opinion that evidence of conspiracy was on the record, and hence statements of co-conspirators would be admitted under

this theory. By this point in the trial, evidence that Mr. Flatley and agents of CoreStates had designed a plan to account for the setoff of Pioneer's funds within the context of the workout agreement was abundantly on the record. On the second occasion (N.T. 6/12/00 a.m. pp. 95-100), counsel interposed a pre-emptive objection to anticipated testimony by Gloria Sadler to her discussions with "people at American Financial." On this occasion, the court held that such statements would enter as "admissions." (*Id.* at 98.) On the third occasion (N.T. 6/27/00 a.m. pp. 61-66)[8] in which instance the court ruled against the defendants when they objected to "all of the hearsay . . . against CoreStates under this so-called conspiracy theory." The court ruled at pages 63-64 that the plaintiff had successfully proved a conspiracy.

Prior to the foregoing record citation the court had held the defendants' objection under advisement, admitting the testimony and determining whether or not to instruct the jury to disregard the conspiracy-related hearsay. Ultimately, the court held that there was sufficient evidence on the record of a conspiracy so that statements of co-conspirators could be admitted pursuant to Pa.R.E. 803(25)(E).

The Pennsylvania cases permitting such "co-conspirator" evidence as an exception to the hearsay rule are largely criminal cases. They are effectively summarized in *Commonwealth v. Dreibelbis,* 493 Pa. 466, 475, 426 A.2d 1111, 1115 (1981), which remains good law in that it is cited by the commentators to the Pennsylvania Rules of Evidence. (See 802-803(25)(E) and Pennsylvania Bar

---

8. Incorrectly cited in the defendant's brief as pp. 63-65.

Institute, Pennsylvania Rules of Evidence with Commentary 1998 p. 125.) In *Dreibelbis* the Supreme Court states: "This exception allows statements by a co-conspirator to be admitted against an accused if the statements are made during the conspiracy, [or] in furtherance thereof, and where there is in other evidence of the existence of a conspiracy. . . . *The co-conspirator exception applies even where no party has been formally charged with conspiracy. Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975). Moreover, a conspiracy, for purposes of the co-conspirator exception to the hearsay rule *may be inferentially established by showing the relation, conduct or circumstances of the parties,* [citing] *Commonwealth v. Roux,* 465 Pa. 482, 350 A.2d 867 (1976)." 493 Pa. at 475, 426 A.2d at 1115. (citation omitted) (emphasis added) In that the Supreme Court does not distinguish between proof of the conspiracy for civil or criminal purposes as a predicate to admission of the hearsay statements, the defendants' plea for a new trial on this ground will be denied.

## ARGUMENTS OF COUNSEL

The defendant bank has asked this court to grant it a new trial based on a finding that "The trial was unfair because of the improper conduct of Pioneer's counsel before the jury." In support of this plea, the defendant cites a collection of extremely argumentative statements by plaintiff's counsel which, if written down on paper, would qualify as neon-lit prose. The gist of plaintiff's counsel's comments, according to the defendant's analysis, was to push the actions in the very questionable con-

duct of the defendant's agents into a criminal, rather than civil, frame of reference.

The court has reviewed the statements of plaintiff's counsel and agrees with the defendant that at times the language plaintiff's counsel used, especially in his closing to the jury, may have crossed the line of advocacy and wandered into the land of the extreme. The court finds that the comments of counsel were an expression of his emotions and frustrations after spending $1.2 million of his client's money in the face of constant cheating and provocations on the part of CoreStates and its lawyers. The court does not find these expressions to be a calculated attempt to inflame or prejudice the jury. If these comments at all infected the jury—and neither this court nor any of the parties will ever have evidence that occurred—this court has already taken precaution against that development by granting the defendant's motion for remittitur. The size of the jury's punitive damage award is excessive, but as the court holds elsewhere in this opinion it is clearly not the result of unthinking passion or prejudice. The jury had before it an earnings statement of a multi-billion dollar corporation and acted in an attempt to punish and deter the corporation's behavior by depriving it of less than one month's profits. However, as the defendant correctly points out, a new trial is only in order based upon counsel's statements if this court holds that the entire verdict was "obtained by incorrect statements or unfair argument or by an appeal to passion or prejudice . . . ." *Todd v. Lit Brothers,* 381 Pa. 109, 113, 112 A.2d 810, 812 (1955).

Since the court has otherwise held that the other, meaningful components of the jury's verdict are clearly based

on the evidence and withstand re-examination in view of the record, the comments of plaintiff's counsel did not infect the jury's entire range of thought. What is more, it was not so much the definitional character of the words used by plaintiff's counsel that were objectionable but the descriptive nature of those words. For example, given the bank's fierce battle to keep the workout agreement out of the record, plaintiff's counsel had every reason, in fact, to use the word "cover-up" to address this conduct. (N.T. 6/5/00 a.m. pp. 50-51, 55.) By extension, then, counsel's comments, though extreme, were ultimately based upon the evidence contained within this exhaustive record. The court cannot reasonably find that counsel's statements were not based on the evidence and tended to influence the jury in resolving the issues before them "solely by an appeal to passion and prejudice . . . ." *Narciso v. Mauch Chunk Township,* 369 Pa. 549, 551, 87 A.2d 233, 234 (1952). It must also be emphasized that at all times this court instructed the jury to base its verdict upon the evidence that proceeded from the witness stand and not to allow their deliberations to be infiltrated by passion or prejudice.

The court finds, in sum, that (1) counsel's statements were extreme, and in the instances cited by the defendant in its brief (see pp. 35-36 of defendant's brief), professionally out of bounds; and, however, (2) each and every statement cited had an ultimate reference to plaintiff's theory of recovery that was in turn grounded upon the facts of record. To the extent that any passion might have slipped into the jury's deliberations governing any aspect of the case, that result is cured by the remittitur herein—which brings the punitive damage

picture into the realm of reason—and no new trial is warranted based upon counsel's statements alone.

## CONSEQUENTIAL DAMAGES

### 1. *The Award of Consequential Damages Was Proper*

The jury awarded Pioneer $13.5 million in consequential damages, meaning that the jury accepted that Pioneer proved that greater damage to its business flowed from CoreStates' wrongful setoff of the loan package funds. CoreStates now asks for post-verdict relief on the grounds that consequential damages were neither properly pleaded nor sufficiently proven. The court will deny CoreStates' motion for a new trial and/or judgment n.o.v. on this ground as well.

### (A) Were Consequential Damages Properly Pleaded?

The defendant and plaintiff both cite in their briefs recognized Pennsylvania practice manuals which hold in essence that so long as a defendant is reasonably placed on notice of the damages to which a plaintiff claims it is entitled then said damages will be submitted to the jury. (See 4 Stan. Pa. Prac. 2d §21:63 (1993), and 2 Goodrich-Amram 2d §1017(b):21). CoreStates further cites Pennsylvania law, specifically 1019(f) of the Pennsylvania Rules of Civil Procedure and cases associated with it which hold that "Items of special damage shall be specifically stated." CoreStates notes that on the eve of trial, Pioneer "sought to slip a claim for consequential damages into its second amended complaint without notice

to counsel and following a representation that the amendment would make no change relating to CoreStates." (See brief of defendant CoreStates p. 38 n.41.) The defendant further notes that this midnight claim by the plaintiff was subject to a motion to strike which was fully litigated by the parties. In examining the motion to strike, the court noted that the damages Pioneer suffered were subject to discovery and examination throughout the exhaustive period of litigation that preceded trial. Indeed, the Superior Court held in *Donlin v. J.J. Newberry Co.,* 319 Pa. Super. 310, 316, 466 A.2d 174, 177 (1983) that damages sought by the plaintiff were properly before the jury so long as the defendants had the means to discover them prior to trial. Furthermore, there is question in this court's mind whether the mandate of Rule 1019(f) applies to specific, *i.e.,* liquidated damages rather than a business loss which a fact-finder would be free to calculate based upon contending evidence presented at trial—the situation in this case. While Pioneer's pleading of consequential damages may be said to be at best not in the most artful form, the court finds that no prejudice adhered to the defendants as a result. At least Pioneer's books were open and readable in the discovery process. By contrast, CoreStates' books were not as well paginated or public.

### (B) Consequential Damages Were Recoverable in This Case

In tort actions in which business losses are demanded Pennsylvania law requires that the evidence presented establish with reasonable certainty that they were proximately caused by the misconduct alleged.(See *Delahanty*

*v. First Pennsylvania Bank N.A.,* 318 Pa. Super. 90, 120, 464 A.2d 1243, 1258 (1983). And that the damages must be a "proximate consequence of the breach, not merely remote or possible." (See *Dairyman's Co-Op Sales Assn. v. McCreary,* 132 Pa. Super. 524, 1 A.2d 508, 510 (1938).)[9]

Because the court has held that consequential damages could be proven and placed them before the jury with an instruction that the defendant does not question (except to disagree that there was causation), the jury's calculation of damages was not subject to the ordinary conversion formula, viz, that the measure of damages is the market value of the property converted plus interest. (See *Berry v. Heinel Motors Inc.,* 162 Pa. Super. 52, 58, 56 A.2d 374, 377 (1948).) Instead, the jury heard Pioneer's principals assert that as a result of the wrongful setoff and failure to explain the bank's conduct, Pioneer lost lines of credit from Nikko Financial Services Ltd. and Banc One. (See N.T. 7/10/00 p.m. pp. 70-74, 7/12/00 a.m. pp. 26-36 and 75-76.)[10]

---

9. The defendant also cites the federal case of *Advent Systems Ltd. v. Unisys Corp.,* 925 F.2d 670, 680 (3d Cir. 1991). While correctly reiterating Pennsylvania law governing the causation and recoverability of damages in the business context, the *Advent Systems* case stands for the proposition that damages for lost profits are not available to a new and untried business. Pioneer was not a new and untried business, despite the defendant's efforts to thus characterize it.

10. Defendant CoreStates takes issue with the court's decision denying its objection to this testimony by Pioneer chairman Boaz Harel because Mr. Harel was not an expert. A glance at the Pennsylvania Rules of Evidence (see Rule 704) defining expert testimony should persuade the interpreter that Mr. Harel's testimony did not fall into the area of scientific knowledge or any other body of information which the jury would be incapable of analyzing without the intervention of a practiced or specialized mind.

The entire issue of whether Pioneer was entitled to recover consequential damages was fully and professionally litigated by the opposing parties. CoreStates, with the aid of its expert, Anthony Creamer, fully articulated its theory that Pioneer's business would have declined with or without the $1.7 million.[11] For its part, Pioneer's Boaz Harel, supported by Albert Nissin, demonstrated Pioneer's decline and satisfactorily related the plaintiff's loss of standing to occurrence of the setoff. Plaintiff also presented evidence from the Nikko concern that Pioneer lost an important credit opportunity in the amount of $200 million due to the plaintiff's inability fully to explain the loss of the settlement proceeds which were converted by CoreStates.

Moreover, a recitation of the whys and wherefores and the reasons for the jury's finding that CoreStates was liable to Pioneer for consequential damages is unneces-

11. CoreStates complains that this court erroneously limited Mr. Creamer's testimony on what the court deemed to be ultimate issues. What concerned the court, as articulated on the record (N.T. 7/24/00 a.m. pp. 5-10), the portion of Mr. Creamer's testimony that the court excluded was his analysis of the events in the Nikko transaction, an interpretation that largely questioned the credibility of other witnesses. To the extent that Mr. Creamer did address ultimate issues it was within this court's discretion to admit or exclude his opinion depending on the helpfulness of the testimony versus its potential to cause confusion or prejudice. See *Kozak v. Struth*, 515 Pa. 554, 531 A.2d 420 (1987) and *Commonwealth v. Brown*, 408 Pa. Super. 246, 596 A.2d 840 (1991). Moreover, a review of Mr. Creamer's testimony would lead any reasonable interpreter to the conclusion that every empirical and opinionated point that this particular expert had to offer came across to the jury. As the plaintiff emphasizes in its brief, this court was exceedingly generous in permitting the defendant to present Mr. Creamer's testimony in that his role as an expert witness was revealed to all parties well beyond the deadline requiring such notice.

sary in this context. So long as the matter was before the jury, absent a showing that the evidence was willfully insufficient, this court will not disturb the jury's finding of consequential damages nor re-examine the amount, which the court finds is objectively based upon the record.

## (C) The Measure of Damages

CoreStates also takes issue with the fact that this court permitted Pioneer to base its claim for consequential damages on the difference between its stock price on November 26, 1997, and its decline thereafter. CoreStates argues that "The more appropriate measure of the company's value was the book value of the business and the more appropriate measure of any consequential damages was the decline in book value after 1997—about $1.7 million to 1998 or $6.2 million to 1999." CoreStates also complains about the court's instruction (N.T. 7/26/00 p.m. p. 83) in which the court alludes to the capitalization and market value of the company on November 26, 1997. A review of the entire charge, however, shows that this court did not bind the jury's consequential damage calculations simply by using the term market value; that term encompasses both the method of damage calculation favored by the plaintiff and that favored by the defendant. The court expanded: "If you find that Pioneer plaintiff [sic] has established by a preponderance of the evidence that the destruction of the business was proximately caused by CoreStates' action and/or American Financial Corporation's action you must determine the damages expressed by the loss in value of plaintiff's business as a result of the conversion." (*Id.* at 84.) CoreStates takes

issue with the use of the stock price as translated into market value as of the date of the conversion and the coincident share price as a measure of damages. This court believes that the option to use the market price was put before the jury by the plaintiff, reiterated by the court in its instruction, but nowhere made binding upon the jury by virtue of its instruction. The jury was free to accept or reject this analysis. While it seems that the jury applied the $13.5 million market value figure in arriving at its assessment of consequential damages, it merely applied a permissible measure of damages.

## PUNITIVE DAMAGES

### I. *Punitive Damages Will Be Remitted*

*"This will never do!"*[12]

The court will grant the defendant's remittitur and reduce the amount of punitive damages awarded to $40,500,000, or three times consequential damages.

In reducing the award of punitive damages while upholding the fact of the punitive damage award, the court takes its guidance from the index of Pennsylvania appellate case law which addresses the issue of punitive damages. Under Pennsylvania law the standard for measuring the acceptability of punitive damages requires the court to determine whether the award falls within the range of fair and reasonable compensation or whether the punitive damage award so "shocks the sense of jus-

---

12. France's Jeffrey (later Lord Jeffrey of the Queen's Bench) beginning his essay on Wordsworth's "The Excursion" from Noyes, R., (Ed.) in *English Romantic Poetry and Prose*, p. 575, Oxford, 1956.

tice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." See *Haines v. Raven Arms,* 536 Pa. 452, 455, 640 A.2d 367, 369 (1994) (citing *Carminati v. Philadelphia Transportation Co.,* 405 Pa. 500, 509, 176 A.2d 440, 445 (1962)). In *Haines,* the Supreme Court reduced an $8 million punitive damage award to $5 million in a case having to do with a 14-year-old plaintiff who sustained permanent injuries in an accidental shooting. In a supplemental opinion, the Supreme Court required that the trial court in reviewing punitive damages find first that a verdict shocks its conscience and set forth the conclusion and the reasons supporting a reduction of the verdict. See *Haines v. Raven Arms,* 539 Pa. 401, 403, 652 A.2d 1280, 1282 (1995).

In following the mandate of *Haines,* this court turns to *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 102, 555 A.2d 800, 803 (1989), which sets forth the task of a jury in determining whether to award punitive damages and, if so, the amount.[13]

---

13. While Pennsylvania law does not require that a punitive damage award bear a proportional relationship to the award of compensatory damages (see *Kirkbride* op. cit. and *Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa. Super. 90, 464 A.2d 1243 (1983)), this court specifically charged the jury that "the punitive damages must not totally be out of proportion to the damages suffered by the plaintiff." (N.T. 7/26/00 pp.86-87.) The court did so, mindful of the constitutional due process considerations that have played a role in the court's review of punitive damages awards. (See *BMW of North America Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 1599 (1996) and *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 482, 113 S.Ct. 2711, 2733 (1993), see especially, *TXO supra.,* at 481, 509 U.S. 113 S.Ct. at 2732 in which the court suggested a ratio of punitive damages to compensatory damages of 500 to 1 may "raise a suspicious judicial eyebrow." Also see *Pacific Mutual* at 23-24, 1046 in

The Superior Court further instructs:

"[T]he court must look to the nature of the conduct engaged in by the defendant, the purpose that punitive damages are intended to achieve, the amount of the award and its likely effect as punishment for the defendant's outrageous conduct, as well as the relationship between the punitive and compensatory awards." *Sulecki v. Southeast National Bank,* 358 Pa. Super. 132, 138, 516 A.2d 1217, 1220 (1986) (citing *Feld v. Merriam,* 314 Pa. Super. 414, 434-38, 461 A.2d 225, 235-37 (1983), *rev'd other grounds,* 506 Pa. 383, 485 A.2d 742 (1984)).

Applying the foregoing analysis, the court in *Sulecki* reduced a punitive damage award of $75,000 to $35,000 in a case in which an automobile dealer had been defamed by a bank. *Id.* at 1220. The court held that a punitive damages award was appropriate in order to punish the bank for its conduct and to deter the bank from future similar conduct, but that $75,000 was not necessary to achieve those goals in that particular case.

This court's power to grant remittitur is subject to review for a clear abuse of discretion or error of law. See *Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 290, 285 A.2d 451, 456-57 (1971).

In all other respects, the jury's verdict in this case was not the result of passion or prejudice or haste. In arriving at a precise consequential damage award, the jury engaged in some very clear-headed arithmetic. The jury further was able to distinguish among the parties in terms

---

which the court states that a punitive damage award of four times the amount of compensatory damages did not "cross the line of constitutional impropriety.")

of liability in finding no liability on the part of defendant Thomas Flatley.

The jury rendered a verdict on the question whether the account into which Pioneer's money was deposited was a general or special account. The foregoing are indicia of the jury's attention span. However, when it came to the award of punitive damages this jury did not follow this court's instruction as conscientiously and dispassionately as the court believes due process would require, only in terms of the amount awarded.

The amount awarded appears to transgress the defendant's due process rights under *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443 (1993), in that it is "grossly out of proportion to the severity of the offense." 509 U.S. at 482. While the jury under the facts of this case had every reason to punish the defendant CoreStates having found essentially that the bank took what belonged to the plaintiff, refused to return it to the plaintiff when properly notified, and as a result drove the plaintiff's business into the ground, this court finds that the degree of punishment was excessive. Among other considerations, the $337 million punitive damage award would likely penalize innocent parties, namely depositors and borrowers who depend on the viability of the bank in order to feel insured of their own financial stability. It is sufficient under the circumstances of this case that CoreStates be required to pay an amount in punitive damages that makes it think twice before engaging in a setoff predicated on like circumstances.

The Supreme Court in *BMW v. Gore,* 577 U.S. 559 (1996) suggests that a court look to applicable legislative sanctions for comparable misconduct in arriving at

a punitive damage award that is not violative of due process. 517 U.S. at 583. The Supreme Court has suggested that in determining whether a punitive damage award is excessive, the court should "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." See *Browning-Ferris Industries of Vt. Inc. v. Kelco Disposal Inc.,* 492 U.S. 257, 301, 109 S.Ct. 2909, 2934 (1989).

Of course, there are no state statutes which punish errant conduct by banks. The only statute that approaches addressing the bank's conduct in the underlying case is the Pennsylvania Unfair Trade Practices and Consumer Protection Act, 73 P.S.A. §201-9.2, which would award treble damages on a finding of unfair trade practices which victimized the consumer. In the business context, and on the federal level, the Sherman Antitrust Act, 15 U.S.C.A. §1-7,15 also adopts the treble damage formulation for predatory business practices. And so, in fairness, this court will apply treble damages in reducing the amount of punitive damages irrationally awarded by this jury. Accordingly, the remittitur is granted and the plaintiff will be required to accept $40,500,000 in punitive damages or face a new trial on the issue of punitive damages.

## II. *AFMC is Not Entitled to Judgment as a Matter of Law on Count VII (Breach of Contract) Because the AFMC Loan Agreement Covered the Transfer of the First and Second Loan Portfolios*

In evaluating a motion for judgment as a matter of law, the court reviews the record "and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his fa-

vor . . . ." *Campo v. St. Luke's Hospital,* 755 A.2d 20, 23 (Pa. Super. 2000), citing *Rohm & Haas Co. v. Continental Cas. Co.,* 732 A.2d 1236, 1247 (Pa. Super. 1999). According to this standard, AFMC cannot prevail on its motion.

The elements of a valid contract are "mutual assent and consideration." *Taylor v. Stanley Co. of America,* 305 Pa. 546, 551, 158 A. 157, 158 (1932). When attempting to determine the intent of the parties to a contract, "[I]t is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Espenshade v. Espenshade,* 729 A.2d 1239, 1243 (Pa. Super. 1999), quoting *Ingrassia Construction Co. Inc. v. Walsh,* 337 Pa. Super. 58, 66, 486 A.2d 478, 483 (1984). According to the express terms of the loan and security agreement, AFMC agreed to repay all advances, including loans, forwarded by Pioneer pursuant to the agreement.

Although AFMC prefers to blame its refusal to honor the contract on the seizure by CoreStates, AFMC was still bound by the terms of the LSA. Its repeated refusal to repay the two loan portfolios to Pioneer constitutes a breach of the contract. Even if all factual inferences were decided in AFMC's *favor,* the defendant could not meet the standard set forth for a judgment as a matter of law.

Although the loans in question are clearly covered by the LSA, the extensive testimony of Pioneer's chief financial officer, Glenda Klein, served to further explain the LSA. The parol evidence rule prohibits a party from introducing evidence regarding the meaning of an agreement where the written agreement is clear and unambiguous on its face. *Sun Co. Inc. (R&M) v. Pennsylvania*

*Turnpike Commission,* 708 A.2d 875, 878-79 (Pa. Commw. 1998). Specifically, parol evidence may not be used to "vary, modify or supersede the written contract." *LeDonne v. Kessler,* 256 Pa. Super. 280, 287, 389 A.2d 1123, 1127 (1978). However, the parol evidence rule does not preclude evidence to either explain or clarify the reason for the agreement in the first place which was to keep RNG viable while AFMC decides whether or not it should rescue the beleaguered mortgage company from its financial woes.

During her testimony, Ms. Klein simply explained the loan portfolio transactions from their initiation through performance. Her testimony merely served to supplement what was already evidenced in both the LSA and the bailee letters, which were attached to both the first and second loan portfolios. Therefore, the parol evidence rule does not apply to Ms. Klein's testimony.

III. *Thomas Flatley is Not Entitled to Judgment As a Matter of Law on Count II (Breach of Contract) Because AFMC Breached the Loan and Security Agreement with Pioneer and Mr. Flatley Was Personally Liable for Any Breach of That Agreement*

As discussed above, AFMC clearly breached the LSA. According to the Flatley guaranty, Thomas Flatley was personally liable for any indebtedness or outstanding obligations of AFMC due Pioneer. (See exhibit T-12.) Since AFMC is liable for breach of contract, Mr. Flatley is also liable by extension of both the LSA and the Flatley guaranty. (See discussion, *supra* at I.) Thus, Mr. Flatley is not entitled to judgment as a matter of law.

### IV. *AFMC and Flatley Are Not Entitled to a New Trial on Counts II and VII (Breach of Contract) Because There Were No Errors Which Caused Prejudice to Either AFMC or Flatley*

When considering a motion for a new trial, the court must first determine whether there were any mistakes made at trial and, if so, whether any of them provided a "sufficient basis" for granting a new trial. *Harman ex rel Harman v. Borah*, 562 Pa. 455, 756 A.2d 1116, 1122 (2000), citing *Spang & Co. v. U.S. Steel Corp.*, 519 Pa. 14, 24-25, 545 A.2d 861, 868 (1988).

The defendants first contend that the court improperly applied the standard for granting a directed verdict. A directed verdict may be granted "only where the facts are clear and there is no room for doubt." *Fetherolf v. Torosian*, 759 A.2d 391, 393 (Pa. Super. 2000), quoting *Lear Inc. v. Eddy*, 749 A.2d 971, 973 (Pa. Super. 2000). Furthermore, the trial court must "consider the facts in the light most favorable to the non-moving party and must accept as true all evidence which supports that party's contention and reject all adverse testimony." *Lear*, 749 A.2d at 973. The plaintiff clearly established at trial that both the loan and security agreement and the Flatley guaranty were valid contracts, and that both parties breached those contracts. The defendants offered no other evidence to dispute these claims, other than the fact that they blamed the entire dispute on CoreStates. Even when considering the facts in the light most favorable to AFMC and Flatley, and accepting as true all of their proffered evidence, neither defendant can prevail.

Neither were defendants prejudiced by the preclusion of Mr. Flatley's testimony. Upon cross-examination by

Pioneer's counsel, Mr. Flatley repeatedly invoked his Fifth Amendment rights against self-incrimination. (N.T. 6/14-6/15/2000.) It is clear that his testimony could not be outcome-determinative for either AFMC or Mr. Flatley himself if he refused to answer any questions. Thus, the court did not err in precluding his testimony.

Finally, the defendants attempt to argue impossibility of performance as a defense to the plaintiff's claim of conversion in a footnote. However, this argument lacks merit because it is clear that the misconduct of Flatley, and by implication AFMC, was the sole reason for the debit restraint which led to catastrophic results for all involved.

## V. *AFMC Is Not Entitled to Judgment As a Matter of Law on Count III (Conversion) Because AFMC Exercised Control Over Pioneer's Money and Agreed With CoreStates to Unreasonably Withhold Possession of the Money From Pioneer*

Pursuant to the standard set forth for a judgment as a matter of law, AFMC cannot prevail. Even if all factual inferences were decided in favor of AFMC, Pennsylvania law does not support a favorable verdict for the defendant. The act of conversion includes "[a]cquiring possession of the goods, with an intent to assert a right to them which is in fact adverse to that of the owner [and] . . . [u]nreasonably withholding possession from one who has the right to it . . . ." *Norriton East Realty Corp. v. Central-Penn National Bank*, 435 Pa. 57, 60, 254 A.2d 637, 638 (1969), quoting Prosser, Torts, §15 (2d edition 1955). Furthermore, the requisite intent does not necessarily have to be a matter of "conscious wrongdoing,"

but "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." 435 Pa. at 60, 254 A.2d at 638-39, quoting Prosser at 70.

Although AFMC vehemently argued that it never exercised dominion or control over Pioneer's money, the agreement between AFMC and CoreStates, which is evidenced by exhibit T-15, suggests otherwise. Initially, AFMC recognized Pioneer's ownership rights in the funds; however, AFMC changed its position when it signed the letter agreement with CoreStates in March of 1998. (See exhibit T-15.) The evidence of AFMC's actions is sufficient to support a verdict of conversion. Although initially AFMC may not have intended to withhold the funds from Pioneer, it did eventually agree to withhold the funds from the plaintiff, to indemnify CoreStates from plaintiff's anticipated onslaught and to keep it secret.

### VI. *The Court Will Mold the Verdict Against Defendants American Financial Mortgage Company and Thomas Flatley to Include Reasonable Attorneys' Fees and Costs pursuant to the Express Language of Both the Loan and Security Agreement and the Flatley Guaranty*

Absent either a written agreement or statutory provision, attorneys' fees are not recoverable in a cause of action. *Fina v. Fina*, 737 A.2d 760, 770 (Pa. Super. 1999), citing *Purdy v. Purdy*, 715 A.2d 473, 474 (Pa. Super. 1998). However, where the contract language is "clear and unambiguous" as to the amount of attorneys' fees recoverable, the provision must be enforced as written.

*Id.* Paragraph 9.3 of the loan and security agreement between Pioneer and American Financial Mortgage Company (admitted as trial exhibit T-8) provides:

"Should lender [Pioneer] be required to enforce the provisions of this agreement or take or defend any legal action against or by borrower [AFMC] or any third party, then lender shall be entitled to payment of any and all costs and attorneys' fees, whether or not suit is actually commenced."

Since Pioneer was required to file a lawsuit and pursue litigation against AFMC, it is clear from this express language that due to AFMC's breach of its obligations, it is liable for all costs and attorneys' fees incurred by Pioneer.

In addition, paragraph 10 of the Flatley continuing guaranty (admitted as trial exhibit T-12) provides:

"Guarantor [Flatley] agrees to pay reasonable attorneys' fees and all other reasonable costs and out-of-pocket expenses which may be incurred by lender [Pioneer] in the enforcement of this guaranty or in any way arising out of, following, or consequential to the enforcement of borrower's [AFMC's] obligations, whether under this guaranty, the agreement, or otherwise."

Further, paragraph 1 of this document provides that Mr. Flatley is obligated to pay to Pioneer "any and all indebtedness and/or obligations of borrower [AFMC] to lender and the payment to lender of all sums which may be presently due and owing and of all sums which shall in the future become due and owing to lender from borrower under the [loan and security] agreement." It is clear that when Mr. Flatley signed this personal guaranty, he was exposing himself not only to the underlying liabil-

ity, but also to the possibility of paying both attorneys' fees and costs, as evidenced by these two provisions. Therefore, both AFMC and Mr. Flatley are liable for attorneys' fees and costs, pursuant to both the loan and security agreement and the Flatley continuing guaranty.

According to uncontested evidence presented at trial, $1.2 million in attorneys' fees were incurred during this litigation. In light of the circumstances surrounding this dispute, the court makes a finding that this amount is reasonable.

VII. *The Court Will Mold the Verdict To Include Prejudgment Interest Against American Financial Mortgage Company, Thomas Flatley and CoreStates Because Such Interest Is Awardable As a Matter of Right in Breach of Contract Cases, and Prejudgment Interest Is Permissible in the Absence of a Contracted Rate Under Certain Circumstances*

According to the Superior Court, "[i]n contract cases, prejudgment interest is awardable as [a matter] of right." *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa. Super. 14, 35, 473 A.2d 584, 595 (1984), citing *Eazor Express Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 520 F.2d 951 (3d Cir. 1975), *cert. denied; Gold & Co. Inc. v. Northeast Theatre Corp.*, 281 Pa. Super. 69, 421 A.2d 1151 (1980). In addition, the right to such interest begins at the time payment is withheld after becoming due. *Palmgreen v. Palmer's Garage Inc.*, 383 Pa. 105, 108, 117 A.2d 721, 722 (1955). The express language of both the loan and security agreement and the Flatley continu-

ing guaranty expressly provide for the interest due Pioneer for advances that were taken and not repaid.

Paragraph 2.3 of the loan and security agreement between Pioneer and AFMC states that:

"Each advance shall bear interest at lender's then applicable base rate (as hereinafter defined) plus two percentage points until the maturity date, and thereafter the interest rate on such advance shall increase by an additional three percent per annum until repaid. For purposes of this agreement, the "base rate" ("floating prime") *shall be the Banc One, Texas prime rate at the time of the advance for loans secured by the mortgage loan and the documents upon which the advance is based."*

According to the evidence, the Banc One prime rate in 1997 was 8.5 percent.

Payment in the amount of $1,779,519.99 was due Pioneer on the first and second loan portfolios on November 26, 1997, and the total interest due under the contract as of today is $890,442.56.

Because AFMC is liable for the interest pursuant to the loan and security agreement, Mr. Flatley is also liable for this amount pursuant to the Flatley continuing guaranty. (See discussion, *supra* at I.)

Although the action brought against CoreStates was not in contract but in tort, Pioneer is also entitled to prejudgment interest from the bank. According to the Superior Court, "the award of prejudgment interest [is] not only a legal right, but also . . . an equitable remedy awarded to an injured party at the discretion of the trial court." *Kaiser v. Old Republic Insurance Co.,* 741 A.2d 748, 755 (Pa. Super. 1999), quoting *Somerset Community Hospital v. Allan B. Mitchell & Associates Inc.,* 454

Pa. Super. 188, 201, 685 A.2d 141, 148 (1996); *Osborne v. Carmichaels Mining Machine Repair Inc.,* 427 Pa. Super. 159, 168-69, 628 A.2d 874, 879 (1993). Restitution in the form of prejudgment interest is necessary to avoid injustice and compensate the plaintiff for the delay. See Restatement of Restitution, §§156, 157. In the absence of a contractual interest rate, interest is calculated as 6 percent from the date the payment is wrongly withheld. See generally, *Kessler v. Old Guard Mutual Insurance Company,* 391 Pa. Super. 175, 570 A.2d 569 (1990). Since the interest on the $1,779,519.99 in compensatory damages began to accrue at the time of the taking on November 26, 1997, the total currently stands at $78,854.29.

## VIII. *The Court Will Not Mold the Verdict to Find That American Financial's Settlement Account Was a Special Account Because the Court Will Not Overturn the Jury's Determination to the Contrary*

A trial court may mold a verdict only to fit the clear intent and desires of the jury. *Mendralla v. Weaver Corp.,* 703 A.2d 480, 485 (Pa. Super. 1997); *Interstate Creamery Inc. v. Reinerth,* 212 Pa. Super. 335, 338, 243 A.2d 451, 452 (1968). When the court exercises its power to mold a verdict, it must not invade the province of the jury. 212 Pa. Super. at 338, 243 A.2d at 452; *Walsh v. Pennsylvania Gas & Water Co.,* 303 Pa. Super. 52, 57, 449 A.2d 573, 575 (1982). Upon hearing all of the evidence in this case and the appropriate charge by the court, the jury specifically determined that the settlement account was a general, not a special, account. (N.T. 6/30/2000 p.m. p. 76.) The jury clearly indicated their answer to the question of classification of the account. The court will not usurp the jury's function and mold the verdict in this way.

## CONCLUSION

This court has denied all defendants' motions for judgment n.o.v., it has granted defendant CoreStates' motion for remittitur and ordered a reduction of punitive damages to $40,500,000.

Furthermore, the court has granted in part and denied in part plaintiff Pioneer Commercial Funding Corporation's motion for post-trial relief.

## ORDER

And now, to wit, December 4, 2000, upon consideration of the motions for post-trial relief filed by defendants CoreStates Bank N.A. and First Union National Bank and all responses thereto and after argument thereon it is hereby ordered and decreed that with the exception of the grant of remittitur said motions are denied.

Judgment is entered in favor of plaintiff Pioneer Commercial Funding Corporation and against defendants CoreStates Bank N.A. and First Union National Bank as follows:

Compensatory damages in the amount of $1,779,-519.99 plus interest of $78,854.29.

Consequential damages in the amount of $13,500,000.

Punitive damages in the amount of $40,500,000.

Total judgment in favor of plaintiff Pioneer Commercial Funding Corporation and against defendants CoreStates Bank N.A. and First Union National Bank is $55,858,374.28.

It is further ordered and decreed, upon consideration of the motion for post-trial relief filed by defendants American Financial Mortgage Corporation and Thomas F. Flatley, and all responses thereto and after argument thereon, that said motion is denied.

It is further ordered and decreed, upon consideration of the motion for post-trial relief filed by plaintiff Pioneer Commercial Funding Corporation, and all responses thereto that said motion is granted in part and denied in part.

Judgment is entered in favor of plaintiff Pioneer Commercial Funding Corporation and against defendants American Financial Mortgage Corporation and Thomas F. Flatley as follows:

Compensatory damages on the contract and conversion claims in the amount of $1,779,519.99 plus interest of $890,442.56.

Attorneys' fees in the amount of $1,200,000.

Total judgment in favor of plaintiff Pioneer Commercial Funding Corporation and against defendants American Financial Mortgage Corporation and Thomas F. Flatley is $3,869,962.55.