628 A.2d 874

Josephine OSBORNE, Administratrix of the Estate of Carl Osborne, Deceased, Appellee,

v.

CARMICHAELS MINING MACHINE REPAIR, INC., Appellant.

Superior Court of Pennsylvania.

Argued May 12, 1993.

Filed July 19, 1993.

160

Ernest P. Dehaas, III, Uniontown, for appellant.

J. William Hook, Waynesburg, for appellee.

Before McEWEN, OLSZEWSKI and FORD ELLIOTT, JJ.

OLSZEWSKI, Judge.

This is an appeal from an order denying the parties' exceptions to the Honorable H. Terry Grimes's order in equity. After a hearing, Judge Grimes ordered appellant corporation, Carmichaels Mining and Machine Repair Company [hereinafter "Corporation"], to pay $126,692.71 plus prejudgment interest to appellee, Josephine Osborne [hereinafter "Josephine"], administratrix of her late husband's estate. We affirm.

Carl Osborne [hereinafter "Osborne"], Joseph Baker, and Paul Roberts founded Corporation as equal shareholders in 1982. At the time, they entered into a corporate stock redemption agreement to provide for, among other things, the death of a shareholder. Upon his death, Corporation was required to purchase the deceased shareholder's stock from his representative at a price established in paragraph 2 of the agreement:

2. Unless altered as herein provided, for purposes of determining the purchase price to be paid for the stock of a stockholder shall be, a floating book value computed at the end of each fiscal year and at other such times as may be required plus the shareholder's percentage of total stock ownership times $300,000 of corporate good will.

Agreement, ¶ 2, reproduced record [R.R.], p. 111a. The agreement also required Corporation to purchase life insurance on the shareholders, naming Corporation as sole beneficiary and owner of the policy. *Id.*, p. 114a. These policies, while owned by Corporation, had a value of $100,000 and their proceeds were to be applied to the purchase of a deceased shareholder's stock.[1]

When Osborne died in 1990, Josephine and the Corporation could not agree on the "purchase price" of Osborne's stock, which represented his ⅓ ownership in Corporation. The parties disagreed primarily because the term "floating book value" was not defined in the contract and is not a term that has any standard meaning under general accounting principles. Thus, while it was clear that Corporation was obligated to purchase Osborne's stock for $100,000 (⅓ of $300,000 representing corporate good will) plus ⅓ of Corporation's "floating book value," the parties could not agree what amount beyond $100,000 Corporation owed for the repurchase of Osborne's stock.

The trial judge heard testimony, from both accounting experts and Osborne's partners[2], to resolve the ambiguity surrounding the term "floating book value." He concluded that the parties intended the term "floating" merely to indicate the parties' desire to measure the book value of the corporation at the end of each fiscal year. Thus, he examined Corporation's 1990 Federal Income Tax statements to determine its most recent book value, which he found to be $90,957.00. He then deducted an amount equal to the cash surrender value of Osborne's life insurance policy ($8,165), and an amount of claimed good will on the tax return ($2,713) from

1. Thus, since Corporation was obligated to purchase the deceased shareholder's stock at a price of ⅓ of $300,000 "corporate good will," and was also responsible to apply $100,000 in insurance proceeds toward the purchase price, the effect of the agreement was that the corporation was liable to the deceased's estate for the value of the insurance policy plus one-third of the "floating book value" of the corporation.

2. The Dead Man's Rule, located at 42 Pa.C.S.A. § 5930, which forbids adverse parties to a transaction with a decedent to testify against the decedent, was not an issue in the proceedings below.

the book value to arrive at an adjusted book value of $80,-078.13. He justified these adjustments on the basis that Josephine had already benefitted from the cash surrender value of the life insurance policy when Corporation realized the $100,000 in benefits under the policy. She also benefitted from the collection of "corporate good will" under the good will figure established by the agreement. The court divided this adjusted book value by three and added it to $100,000, arriving at a purchase price of $126,792.61. He also awarded Josephine prejudgment interest on the insurance proceeds from the date of receipt, and on the adjusted book value from the date of Osborne's death.

Corporation makes three claims on this appeal: (1) the trial court erred in refusing to adjust the book value of the corporation to represent the cash surrender value of the life insurance policies of all three partners; (2) Josephine admitted that Corporation only owed her $115,171 (the figure that Corporation argues it owes under its first argument) by failing to file a responsive pleading to its new matter; and (3) the trial court erred in awarding prejudgment interest.[3] We will address each argument in turn, beginning, however, with Corporation's second claim. At the outset we note that our scope of review in equity matters is narrow. We are limited to determining whether findings of fact are supported by competent evidence, whether an error of law has been committed, or whether there has been a manifest abuse of discretion. *Hercules v. Jones*, 415 Pa.Super. 449, 609 A.2d 837 (1992).

## I.

This case, at its most fundamental, boils down to whether Corporation owes Josephine $126,000 as the trial court found, or $115,171 as Corporation calculates, for the redemption of

---

**3.** Josephine, as appellee, raises the issue of whether the trial court properly deducted $2,713 representing the good will asset as indicated on Corporation's tax return. This issue was decided against Josephine when the trial court denied her exceptions. Since Josephine did not file a cross appeal as to this issue, as she is permitted to do under Pa.R.A.P., Rule 903(b), we will not address it.

Osborne's stock. We will discuss the substance of this claim below. As a matter of first instance, however, Corporation contends that Josephine admitted that Corporation's indebtedness is limited to $115,171 since she did not respond to new matter which contained that very allegation. We disagree.

In its answer to Josephine's complaint, Corporation included several allegations under the heading "New Matter," the most damning of which occurs in paragraph 15: "Pursuant to the agreement, upon the death of Carl Osborne, his estate was entitled to $100,000 through the proceeds of the insurance policy insuring his life and one-third of $45,513. Therefore, as a result of his death, his estate was entitled to $115,171." R.R. at 10A. As written, the new matter is nothing more than a legal conclusion that $45,513 is the appropriate "floating book value" of Corporation under the agreement. The issue of properly valuing the "floating book value," however, is the very issue that Josephine raised in her complaint, and which Corporation denied in its answer. Corporation's factual allegations in new matter were not extrinsic to Josephine's factual averments, were not properly included in new matter, and Josephine was therefore not required to respond to them. *Watson v. Green*, 231 Pa.Super. 115, 331 A.2d 790 (1974). Moreover, insofar as Corporation's new matter contained purely legal conclusions, such as paragraph 15, no response was required to such conclusions, and Josephine's lack of response is considered a denial. *Gottwalt v. Dellinger*, 395 Pa.Super. 439, 577 A.2d 623 (1990). Corporation's first claim fails.

## II.

Corporation claims next that the trial judge should have adjusted the "book value" of Corporation by excluding the cash surrender value of each partner's life insurance policy before it set the purchase price of Osborne's stock. We disagree.

In interpreting the value of shares pursuant to a stock redemption agreement, our only useful authority is the

language of the agreement itself. *Block v. Mylish,* 351 Pa. 611, 41 A.2d 731 (1945). In interpreting the agreement, we must determine the intent of the parties as expressed through the express language of the agreement, and only as to ambiguous terms may we consider extrinsic evidence. *Raiken v. Mellon,* 399 Pa.Super. 192, 582 A.2d 11 (1990).

As we noted above, Corporation purchased three life insurance policies, valued at $100,000 each, pursuant to paragraph 6 of the agreement. Under paragraph 6, the corporation was the owner and beneficiary of each policy and was required to pay the premiums. R.R. 114A. Paragraph one of the agreement requires Corporation to purchase the stock of a deceased partner at a purchase price, which is defined in paragraph 2. The purchase price is defined as the "floating book value at the end of each fiscal year ... plus the percentage of total stock ownership times $300,000 of corporate good will." That paragraph provides further:

> The Corporation and the Shareholders shall redetermine the value of the stock within seventy five days following the end of each fiscal year. Such redetermination shall be recorded on Schedule C attached hereto and made a part hereof.

R.R. 111A. Since neither Corporation nor the shareholders ever "redetermined" the value of the stock, the parties, and subsequently the court, were left to determine the ambiguity left by the term "floating book value."

"Book value" has a standard meaning under general accounting principles; that is, standard "book value" refers to the assets of a company over its liabilities. Thus, even though "floating" book value has no accepted meaning in accounting circles, it appears that the parties intended to utilize standard book value, albeit subject to yearly change. The second half of paragraph 2, which calls for a redetermination of the value of the stock, supports a conclusion that "floating" is descriptive of the changing nature of Corporation's book value. Furthermore, the cash surrender value of an insurance policy which names Corporation as beneficiary is considered an asset of the company for purposes of determining its book value,

since Corporation is entitled to utilize the cash value by, for example, borrowing against the policy. *See,* N.T. 5/21/92. Thus, reading paragraph 6 (regarding ownership of the life insurance policies by the corporation) together with paragraph 2 (regarding the "floating book value"), it becomes evident that the value of the stock necessarily includes the cash surrender value of any insurance policies held by Corporation.

Corporation contends that the cash surrender value of the life insurance policies should not be included in its "book value." Corporation bases this argument on the testimony of the surviving shareholders who claimed that the life insurance policies were procured merely to cover the value of the repurchased stock of a deceased shareholder. They testified that they did not anticipate that the "value" of the company would ever exceed $300,000, thus the $100,000 insurance benefits received by Corporation would be utilized to cover the repurchase price of a deceased's shareholder's stock. Corporation's argument, however, ignores paragraph 2, which requires Corporation to repurchase the stock at a purchase price of one-third of an arbitrary good will figure of $300,000 (*i.e.,* $100,000) plus the book value of the shares owed to the deceased shareholder. The $100,000 for good will is an absolute figure. Thus, a reasonable interpretation of the contract indicates that the $100,000 life insurance policy was meant to cover the "good will" figure and not the value of the company.

Corporation asserts that its interpretation is supported by paragraph three of the agreement, which provides:

> If the Corporation should be obligated to pay as the purchase price for the deceased Stockholder's stock an amount in excess of the proceeds from any life insurance proceeds referred to in Article 6, the Corporation may, at its option, pay such excess in full or pay any portion of it as soon as the amount is ascertained and the balance, if any, in not more than 60 monthly installments.

R.R. at 111A. We disagree. As we noted, Corporation owned all insurance policies on the shareholders. It had the option, at its election, to retain the income from the policies, cash them in, or borrow against them. Thus, it is altogether

conceivable that Corporation would be indebted to the insurance company when it received the benefits of a policy, and thus its "proceeds" might be less than $100,000, the minimum purchase price for a deceased shareholder's stock. Thus, paragraph 3 merely protects Corporation from having to sell assets or take otherwise unreasonable measures in the event that one of its shareholders died. *C.f. Block v. Mylish, supra,* 351 Pa. at 618–20, 41 A.2d at 735–736. Thus, paragraph 3 is not rendered superfluous by holding Corporation liable for a purchase price over $100,000.

Corporation also argues that the parties intended to realize the proceeds of the life insurance policies separate from the "book value" of the corporation in the event of death. We disagree and demonstrate our disagreement by using Corporation's hypothetical, provided in its brief:

Perhaps the best way to illustrate that it is not appropriate to include the cash value of these policies in the price to be paid for Osborne's shares is to assume that the corporation had ceased doing business (which it had as of the date of the trial); that it had no assets other than three life insurance policies; and that all of the shareholders died at the same time, as in a common accident. The balance sheet on the corporation's tax return for the year ending before the death of the three shareholders would show the cash value of the polices as the only asset of the corporation. As of September 30, 1989, that aggregate cash value was $42,731. If the Agreement's "floating book value" was to include the cash value of the life insurance policies, the estate of each of the shareholders would be entitled to $100,000, plus one third of the cash value on the policies of the other two. However, the corporation would only be entitled to $100,000 in proceeds from each of the policies, as the cash value is part of the $100,000 face amount of the policy at any given time. Therefore, the corporation would have no other source from which to pay anything more than $100,000 to each shareholder's estate. Under those circumstances, common sense and the general intention of the parties would require an interpretation of the Agreement that the

> personal representative of each shareholder would be entitled to $100,000, not $100,000 plus one third of the cash value of the polices which insured the lives of the other two shareholders. The same concept should apply whether one or all of the shareholders died.

Corporation's brief, p. 14. We agree with everything except Corporation's last sentence.

In Corporation's hypothetical, a deceased shareholder is not entitled to share in the cash surrender value of the other shareholder's policy for one simple reason. The cash surrender value of the deceased shareholder's is no longer an asset of the Corporation, because the policy benefits were realized upon the death of the insured. Here, however, the cash surrender value of the surviving shareholders' policies remained an asset of the Corporation, available for full use. Thus, the trial court deducted the cash surrender value of Osborne's policy, because upon realization of the proceeds (which were ultimately payable to Osborne's estate as "corporate good will"), the cash value of Osborne's policy was no longer Corporation's asset. We find that the trial court fully implemented the parties' intentions under the agreement by excluding the cash surrender value of Osborne's policy and including the cash surrender value of the surviving shareholders' policies when determining Corporation's "floating book value."

### III.

Corporation argues last that the trial judge improperly assessed prejudgment interest. The Court assessed interest at 10% per annum: (1) on the insurance proceeds running from the day Corporation received them, and (2) on the "book value" of the corporation form the day Osborne died. Corporation argues that awarding prejudgment interest was error because the contract was ambiguous regarding what it owed and that it dealt with Osborne's estate in good faith.

Whether a party is entitled to prejudgment interest is left to the sound discretion of the trial court in equity.

*Gurenlian v. Gurenlian,* 407 Pa.Super. 102, 595 A.2d 145 (1991). A court of equity is not limited to the statutory rate of interest, but may make an award above it. *Id.* Here, the agreement only provides for interest, calculated at ten percent per annum, if the corporation elects to pay the purchase price in excess of life insurance policy proceeds in installments. As the trial court duly notes, however, the agreement is silent regarding when Corporation is obligated to purchase the deceased shareholder's stock, and is therefore silent regarding interest in this regard. Thus, the trial court held that the contractual interest rate was proper as to both insurance proceeds and the "book value" of the stock because Corporation, knowing it was obligated to purchase the stock, kept those funds and stayed in business pending the litigation. This is not an abuse of discretion. We note, furthermore, that the fact that the actual obligation under the agreement was not liquidated until after trial does not preclude an award of prejudgment interest. *See, Spang & Co. v. USX Corp.,* 401 Pa.Super. 254, 599 A.2d 978 (1991), *alloc. denied,* 531 Pa. 640, 611 A.2d 712 (1992).[4]

The order denying exceptions is affirmed. Jurisdiction relinquished.

---

**4.** We note that in *Spang,* we held that awards of prejudgment interest in contract cases are generally limited to a 6% rate of simple interest. 401 Pa.Super. at 266, 599 A.2d at 984. *Spang,* however, was a case at law and, as we noted above, trial courts sitting in equity are not limited to the statutory rate. We cite *Spang* only for the proposition that a party may not escape imposition of prejudgment interest based on a claim that their obligation was not liquidated until a court set the final amount due. To hold otherwise would encourage needless litigation of claims under agreements either at law or in equity, such as here.