J-A15004-17

2017 PA Super 395

| D. ALLEN HORNBERGER | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | Appellant | |
| | v. | |
| DAVE GUTELIUS EXCAVATING, INC. | | |
| | Appellee | No. 103 MDA 2017 |

Appeal from the Judgment Entered December 19, 2016
In the Court of Common Pleas of Union County
Civil Division at No(s): 15-085

BEFORE:  MOULTON, J., SOLANO, J., and MUSMANNO, J.

OPINION BY MOULTON, J.:                    **FILED DECEMBER 15, 2017**

D. Allen Hornberger appeals from the December 19, 2016 judgment entered in the Court of Common Pleas of the 17th Judicial District (Union County Branch) in favor of Dave Gutelius Excavating, Inc. ("DGE") following a non-jury trial.  We affirm.

DGE is a closely held Pennsylvania corporation that operates an excavation construction business.  Hornberger worked as a land surveyor for DGE from March 1999 until November 2011.  In February 2006, Hornberger bought 10 shares of common capital stock in DGE pursuant to a stock purchase agreement.  On February 16, 2006, Hornberger also entered into a shareholders' agreement ("Agreement") with DGE and other shareholders. Under paragraph 3 of the Agreement, DGE retained the right to redeem Hornberger's 10 shares if he ceased being an employee:

In the event that **Hurst, Gramly, Beaver, Shaffer, or Hornberger** resign[s], retires, or otherwise voluntarily or involuntarily terminates his employment with [DGE], [DGE] shall have the right to redeem all or part of the shares of stock of [DGE] owned by such ***Stockholder*** within thirty (30) days of the ***Stockholder's*** termination as to whether it desires to redeem all or part of the stock of [DGE] owned by the ***Stockholder*** and, if so, the number of shares which it desires to purchase at a price to be determined and paid in accordance with the provisions of Paragraph 5 hereof. . . .

Agmt. ¶ 3 (emphases in original). Paragraph 5 of the Agreement further provides:

With respect to the purchase price for any shares in [DGE] of **Hurst, Gramly, Beaver, Shaffer, or Hornberger** purchased pursuant to Paragraphs 2, 3 and 13 hereof relating to the voluntary or involuntary relinquishment of a ***Stockholder's*** shares in [DGE] shall be calculated by reference to the ***"Adjusted Net Book Value."*** The term ***"Adjusted Net Book Value"*** shall mean the value of [DGE's] shares as of the end of the month immediately preceding the sale or transfer, as determined by [DGE's] independent certified public accountants, subject to the following provisions:

(i) No allowance shall be made for the goodwill or trade name of [DGE].

(ii) Accounts payable shall be taken at face amounts less discounts deductible therefrom, and accounts receivable shall be taken at face amount less discounts less a reasonable reserve for bad debts.

(iii) All real property . . . and all tangible personal property . . . shall be taken into account at their fair market value as of the date of the proposed sale or transfer. . . .

*Id.* ¶ 5 (emphases in original).

Hornberger voluntarily quit his employment with DGE on November 30, 2011. After obtaining a valuation from Bradley D. Kellett, an independent certified public accountant ("CPA"), DGE sought to redeem Hornberger's 10 shares of stock for the purchase price of $42,800. Kellett's valuation letter stated:

> I have calculated the adjusted net book value of [DGE] as of August 31, 2013 for use in determining the value to be paid to Allen Hornberger who currently owns 10 shares of common stock of the corporation. . . .
>
> The net book value as of August 31, 2013 is calculated as $6,436 per share before discounts for a minority interest and lack of marketability. These types of discounts are widely used in valuation methodologies . . . .
>
> . . . I used a conservative minority discount of 30% and a conservative lack of marketability discount of 5%, as appropriate. As a result, the minority interest discount is $1,931 per share and the lack of marketability discount is $225 per share.
>
> The adjusted net book value per share of the corporation's stock after discounts is $4,280. Using this per share adjusted net book value, the adjusted net book value of [Hornberger's] 10 shares would be $42,800.

Kellett Ltr. to DGE, 5/1/14, at 1.

On September 9, 2014, DGE filed an action in equity for specific performance under the Agreement. On April 11, 2014, the trial court issued a preliminary injunction, ordering Hornberger to surrender his shares within seven days and ordering DGE to pay Hornberger $42,800. Both parties complied, and the trial court dissolved the preliminary injunction.

On February 12, 2015, Hornberger filed suit against DGE, alleging that DGE improperly discounted the value of Hornberger's shares in violation of

the Agreement. Hornberger asserted that his 10 shares should have been valued at $64,360, rather than $42,800, and sought judgment in the amount of $21,560, the difference between the two figures.

In his expert report, Kellett explained the rationale for his valuation of Hornberger's shares as follows:

> The calculated adjusted net book value of [DGE] as of August 31, 2013 was $6,371,402 or $6,436 per share based on 990 shares outstanding. The amount was calculated by taking the net book value . . . and reducing it by equipment at depreciated cost of $2,795,889 and increasing it by equipment at fair value of $3,905,795 (per appraisal). The result was $6,421,402[,] which was further reduced by bad debts of $50,000 (for accounts receivable greater than 200 days old).
>
> As the Agreement provides, our CPA firm did take the above provisions into account, but that did not limit any other adjustments which our firm determined were applicable to the shares being valued. Given that Mr. Hornberger only owned approximately one percent (1%) of the outstanding issued shares, it is our professional opinion, and in accordance with current valuation methodologies, that a minority discount and lack of marketability discounts are appropriate. The Agreement did not limit our professional discretion as it related to adjusting the net book value of [DGE]. In our view, Paragraph 5 of the Agreement was intended to keep the value of each share much lower so as not to reward any shareholder/employee who decides to voluntarily leave [DGE]. Thus, the per share value was reduced by a minority discount of 30% and lack of [marketability] discount of 5%. Thus, the adjusted net book value per share of [DGE's] stock after the discounts is $4,280.

Kellett Rpt., 11/7/16, at 1-2.

The trial court held a non-jury trial on November 22, 2016. At trial, Hornberger presented the testimony of CPA Brian Elsasser. Elsasser disagreed

with Kellett's valuation only insofar as Kellett applied discounts for minority ownership and lack of marketability. Elsasser concluded that the contract language – specifically the listing of three mandated adjustments in subparagraphs (i) through (iii) – was exclusive and did not permit further adjustments for lack of marketability or minority interest. N.T., 11/22/16, at 35-36. Using his understanding of the method of calculation outlined in paragraph 5 of the Agreement, Elsasser opined that the adjusted net book value of Hornberger's shares was $64,360 and, thus, DGE owed Hornberger $21,560. *Id.* at 36-37. In response to questions from the trial court, Elsasser conceded that had the Agreement not included a list of particular adjustments, then he would have had to consider applying discounts for minority ownership and lack of marketability to arrive at the adjusted net book value. *Id.* at 46-47.[1]

In addition to offering Kellett's expert report into evidence, DGE presented the testimony of CPA Eric Blocher. Blocher testified that the method for determining adjusted net book value in the Agreement is a fair-market-value-based calculation. *Id.* at 60-61; *see id.* at 80 ("[Paragraph 5] does say the adjusted net book value which is a fair market value method."). Blocher further testified that when determining adjusted net book value in a closely held corporation, it is customary in the accounting industry to apply discounts

---

[1] Hornberger also testified on his own behalf. Although he did not offer testimony as to the parties' intent, Hornberger noted that paragraph 5 of the Agreement does not list minority interest and lack of marketability discounts as adjustments that must be made to the book value. N.T., 11/22/16, at 10.

for lack of marketability and minority interest. *Id.* at 61, 64-65. Blocher opined that Kellett's application of those discounts, and the valuation of Hornberger's shares at $42,800, were proper under the Agreement. *Id.* at 67-68.

At the conclusion of trial, the trial court entered a verdict in DGE's favor, concluding:

> [T]he adjustments are proper and consistent with the language in the [Agreement].[2] The Court does not find the contract to be vague or ambiguous. It seems clear and unequivocal. It's the adjusted net book value. That is determined by the standard practices in the industry. . . .
>
> The Court finds that the adjustments should have been made; and that based on the adjustments, the value of [Hornberger's] shares [is] $42,800.

*Id.* at 104.

Hornberger filed a timely post-trial motion, which the trial court denied on December 13, 2016. After the entry of judgment on December 19, 2016, Hornberger timely appealed to this Court. On January 20, 2017, Hornberger filed a Pennsylvania Rule of Appellate Procedure 1925(b) statement of errors complained of on appeal. The trial court did not file a Rule 1925(a) opinion, relying instead on its oral decision rendered at the conclusion of the November 22, 2016 trial.

On appeal, Hornberger raises the following issue: "Did paragraph 5 of the [Agreement] permit [DGE's] CPA to apply discounts for minority interest

---

[2] According to the transcript, the trial court said "statute." Given the context, however, the court plainly meant "Agreement."

and lack of marketability in order to reduce the value of [Hornberger's] ten (10) shares of stock?" Hornberger's Br. at 4 (full capitalization omitted).

Our standard of review of a non-jury verdict is limited to determining "whether the findings of the trial court are supported by competent evidence and whether the trial court committed an error in any application of the law." **Stephan v. Waldron Elec. Heating & Cooling LLC**, 100 A.3d 660, 664 (Pa.Super. 2014) (quoting **Wyatt Inc. v. Citizens Bank of Pa.**, 976 A.2d 557, 564 (Pa.Super. 2009)). "We consider the evidence in a light most favorable to the verdict winner" and will reverse only if the trial court's "findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law." **Id.** at 664-65. Further, "[t]he interpretation of any contract is a question of law[,] and this Court's scope of review is plenary." **Id.** at 665 (quoting **Humberston v. Chevron U.S.A., Inc.**, 75 A.3d 504, 509 (Pa.Super. 2013).

Hornberger asserts that the trial court erred in concluding that the Agreement permitted discounts for minority interest and lack of marketability when such discounts were not expressly included in the Agreement. In response, DGE contends that although the Agreement identifies certain adjustments that must be made, it does not prohibit additional adjustments that are determined by the CPA to be customary in the accounting industry.

It is well settled that "[t]he fundamental rule in contract interpretation is to ascertain the intent of the contracting parties." **Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.**, 905 A.2d 462, 468 (Pa. 2006). "When

the words of a contract are clear and unambiguous, the intent of the parties is to be discovered from the express language of the agreement." *Raiken v. Mellon*, 582 A.2d 11, 13 (Pa.Super. 1990). Moreover, "[i]n interpreting the value of shares pursuant to a stock redemption agreement, our only useful authority is the language of the agreement itself." *Osborne v. Carmichaels Mining Mach. Repair, Inc*., 628 A.2d 874, 877 (Pa.Super. 1993).

Here, the Agreement provides that the purchase price of Hornberger's shares "shall be calculated by reference to the *'Adjusted Net Book Value.'*" Agmt. ¶ 5 (emphasis in original). Paragraph 5 then states:

> The term *"Adjusted Net Book Value"* shall mean the value of [DGE's] shares as of the end of the month immediately preceding the sale or transfer, as determined by [DGE's] independent certified public accountants, subject to the following provisions:
>
> (i)     No allowance shall be made for the goodwill or trade name of [DGE].
>
> (ii)    Accounts payable shall be taken at face amounts less discounts deductible therefrom, and accounts receivable shall be taken at face amount less discounts less a reasonable reserve for bad debts.
>
> (iii)   All real property . . . and all tangible personal property . . . shall be taken into account at their fair market value as of the date of the proposed sale or transfer. . . .

Agmt. ¶ 5 (emphasis in original).

In construing this language, the trial court observed that the Agreement does not define the phrase "adjusted net book value," stating, "[Paragraph 5] doesn't say, This is the definition of adjusted net book value. It says it's the adjusted net book value with the three qualifications." N.T., 11/22/16, at

- 8 -

103; **see also id.** ("[A]djusted net book value is not defined. It is qualified.").

Based on its conclusion that "adjusted net book value" is undefined, the trial court stated, "When [a contract term] is not defined, we have to look to the standard, the normal and accepted practices within the industry." **Id.** Relying on Kellett's expert report and the testimony of both CPAs, the trial court concluded that the adjustments for lack of marketability and minority interest were proper and, thus, "the value of [Hornberger's] shares [is] . . . $42,800." **Id.** at 104. After reviewing the language of the Agreement and the trial testimony, we agree.

The parties do not dispute the meaning of "book value."[3] Rather, the central interpretive dispute involves the meaning of "adjusted." Hornberger contends that "adjusted" is defined, and thus limited, by reference to the three adjustments listed in paragraph 5. In other words, Hornberger argues that the only permissible adjustments to book value are those expressly listed in the Agreement – relating to good will, discounts to accounts payable and accounts receivable, and the appraisal of real and tangible personal property. DGE, in contrast, argues that the specific adjustments listed in the Agreement are non-exclusive and that its CPA appropriately made additional adjustments consistent with business valuation standards. We agree with DGE.

---

[3] Our Court has explained that "'[b]ook value' has a standard meaning under general accounting principles; that is, standard 'book value' refers to the assets of a company over its liabilities." **Osborne**, 628 A.2d at 878; **see also** N.T., 11/22/16, at 27 (according to Elsasser, "what book value basically means are the assets on the balance sheet minus the liabilities").

Expert testimony from both sides supported the general proposition that adjustments based on minority interest and lack of marketability are standard industry practice when valuing shares in closely held corporations. ***See, e.g.***, N.T., 11/22/16, at 46-47 (testimony of Brian Elsasser); ***id.*** at 56-62 (testimony of Eric Blocher). The ultimate conclusion of Hornberger's expert – that such adjustments were not appropriate in this case – was based not on his accounting or valuation expertise but instead on his interpretation of other language in the Agreement. Specifically, he testified, and Hornberger argues to this Court, that the listing of three specific adjustments in the Agreement precluded the use of other, ordinarily appropriate adjustments. ***See id.*** N.T. at 35-36; Hornberger's Br. at 12-14. We disagree. Not only does the Agreement contain no such limiting language, but its terms contemplate adjustments to book value beyond those listed in subparagraphs (i) through (iii).

The Agreement expressly provides that, in the case of a departing shareholder, "the value of [DGE's] shares" shall be "determined by [DGE's] independent certified public accountants." Agmt. ¶ 5. That valuation, by its terms, is an adjustment to book value based on the expertise of DGE's CPAs. No one disputes that adjustments for minority interest and lack of marketability are consistent, as a general matter, with expert valuation methodologies. The Agreement then provides that the application of that expertise is "subject to the following provisions," which address good will, accounts payable and receivable, and the valuation of real and personal

property. ***See id.*** The listing of three types of adjustments that DGE's accountants **must** make cannot reasonably be understood to preclude the application of any other adjustments that valuation experts would ordinarily make. Indeed, the structure of the relevant provision calls on DGE's CPAs to determine the value of the shares, which presumptively calls for the exercise of their professional judgment, and only then mandates the application of particular adjustments. While the parties could have contracted to exclude other adjustments, they did not do so here.[4]

Accordingly, we conclude that the trial court properly applied the law and its findings are supported by competent evidence.

Judgment affirmed.

_____

[4] As Hornberger points out, paragraph 5 of the Agreement provides two different valuation methods – one for determining the value of shares following a stockholder's death, and another for determining the value of shares when a stockholder voluntarily or involuntarily terminates his employment. Paragraph 5 states that the value of a deceased stockholder's shares is "equal to the fair market value of the . . . stock" as determined by DGE's CPA, whereas the value of a terminated stockholder's shares is equal to the "adjusted net book value" as determined by the CPA. Agmt. ¶ 5. Hornberger asserts that the absence of the phrase "fair market value" from the latter portion of paragraph 5 precludes the use of fair-market-value-based discounts. Hornberger's Br. at 17-18. We disagree.

As discussed above, Blocher explained that an adjusted-net-book-value calculation, by definition, is an asset-based approach "whereby all assets and liabilities, including off-balance sheet, intangible, and contingent items are adjusted to their fair market value." N.T., 11/22/16, at 59; ***see id.*** at 60-61, 80. Moreover, all three experts appeared to agree that minority interest and lack of marketability discounts are customarily applied when valuing shares in closely held corporations, no matter which valuation method is used. In any event, contrary to Hornberger's contention, nothing in the language of the Agreement precludes the use of fair-market-value-based adjustments to the book-value calculation.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/15/2017</u>