J-A26003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ERALDO QATO, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF AMERICA'S HOME CARE, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PETRAQ XOXE, IMELDA XOXE, AND ALB CARE, INC. | : | |
| | : | |
| APPEAL OF: PETRAQ XOXE | : | No. 2128 EDA 2020 |

Appeal from the Judgment Entered October 28, 2020
In the Court of Common Pleas of Bucks County Civil Division at No(s):
No. 2017-02741

| | | |
|---|---|---|
| ERALDO QATO, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF AMERICA'S HOME CARE, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| PETRAQ XOXE, IMELDA XOXE, AND ALB CARE, INC. | : | No. 2161 EDA 2020 |

Appeal from the Judgment Entered October 28, 2020
In the Court of Common Pleas of Bucks County Civil Division at No(s):
No. 2017-02741

BEFORE:  BOWES, J., STABILE, J., and McCAFFERY, J.

MEMORANDUM BY BOWES, J.:                          **FILED MARCH 4, 2022**

Eraldo Qato ("Qato"), individually and derivatively on behalf of

America's Home Care, Inc. ("AHC"), and Petraq Xoxe ("Xoxe"), have cross-

appealed from the judgment entered against Xoxe and in favor of AHC following a non-jury trial. Upon review, we vacate the judgment, affirm in part and reverse in part the parties' motions for post-trial relief, and remand for further proceedings consistent with this memorandum.

Qato and Xoxe are entrepreneurs whose families knew each other in Albania. When Qato moved to Pennsylvania, he obtained employment as a care manager with Philadelphia Corporation for Aging. Xoxe at the time was living in New Jersey and working in the medical field as a cardiovascular technician. The men from time to time discussed opening a business, brainstorming ideas ranging from importation of stone from Albania to adult day care to opening a restaurant. In 2013, when the two men encountered each other after not having spoken in a while, Qato suggested to Xoxe that there was a business opportunity in the home care field[1] catering to the Albanian- and Greek-speaking communities. *See* N.T. Trial, 8/28/19, at 26-30.

Qato and Xoxe settled on a plan to incorporate AHC and run it as equal partners. As Qato did not have funds for the initial capital investment, Xoxe covered that $50,000 himself, with the understanding that he would be repaid

---

[1] Home care service companies employ direct care workers to provide services such as dressing, grooming, bathing, medication management, and food preparation for seniors and disabled adults, who are the clients. *See* N.T. Trial, 8/28/19, at 38-39. Often, the direct care worker is a family member of the client. The company pays the direct care worker, then receives reimbursement for the client through Medicaid. *Id*.

once AHC became profitable. While continuing in his other employment, Qato worked with Xoxe to obtain the necessary license for AHC. Once AHC was licensed and operating, Xoxe, AHC's only director and officer, solicited business and handled administrative work. Qato, still working at his other full-time job, assisted with the paperwork and did his part to spread word about AHC in the community. *Id*. at 31-36.

As AHC began to grow, Xoxe encouraged Qato to quit his other job and work full time at AHC, which Qato did in October 2014. Through the efforts of both men, AHC expanded from approximately forty clients and gross sales of near $1.6 million in 2015 to $2.7 million with more than double the clients in 2016. Both Xoxe and Qato earned six-figure salaries, and AHC employed Qato's sister Pema to manage the office and answer calls and emails. AHC had achieved sufficient profitability by mid-2016 that AHC reimbursed Xoxe his $50,000 investment. Also at that time, the company changed from a non-stock to a stock corporation, and Xoxe transferred 50% of the shares to Qato, who took on additional responsibilities such as becoming the administrator of AHC. The company continued to prosper, with revenue of $3.35 million in 2017, and profits distributed to the shareholders on top of their increased salaries as employees of AHC. *Id*. at 37-55; N.T. Trial, 8/29/19, at 46.

Meanwhile, Qato and Xoxe's relationship deteriorated in the summer of 2016, after Xoxe went on a two-month vacation with his family, leaving Qato and Pema alone to prepare for a state compliance audit. When Xoxe returned,

he no longer engaged in conversation with Qato, speaking only to Pema. Xoxe ceased bringing in new clients or otherwise putting effort into the business. Xoxe then fired Pema without consulting with Qato. Then, a few weeks later, thirty-three of AHC's 100 clients abruptly left without warning. N.T. Trial 8/28/19, at 56-70, 149. There had been no prior complaints from these customers. Their caregivers, most of whom were family members, afterwards expressed confusion, as they were unaware that they were switching agencies and thought that paperwork which they had signed related only to AHC opening a new office. *Id*. at 70, 157.

It turned out that Xoxe's wife, Imelda ("Imelda"), who had briefly worked for AHC, was displeased with her husband's plan to make Qato a full partner of the company. Since she did not wish for her family to have to share profits with Qato, she decided to form her own business and recruit AHC's clients. *See* N.T. Trial 8/29/19, at 68-69. With Xoxe's full knowledge, Imelda incorporated her own business, ALB Care, Inc. ("ALB"), in March of 2016, and began the process of obtaining a license for it to provide home care services. Imelda initially listed AHC's address as that for ALB, and Xoxe informed caregivers that AHC was opening a new office at the location which ultimately became ALB's office. N.T. Trial 8/28/19, at 154, 201. Imelda used $175,000 of the assets which she and Xoxe held jointly, with Xoxe's knowledge and consent, to capitalize ALB. *Id*. at 205-06; N.T. Trial 8/29/19, at 51, 88. Xoxe provided business advice to Imelda, and assisted their daughter, who at the

time was an employee of AHC, in obtaining the necessary certification for ALB to operate. *Id*. at 218; N.T. Trial, 8/29/19, at 12. When ALB became authorized to do business, Imelda and her daughter immediately completed the paperwork to transfer thirty-three of AHC's clients and caregivers to ALB. N.T. Trial, 8/29/19, at 68-69. Xoxe acknowledged that he was aware that Imelda's plan for ALB was to target even more of AHC's customers, and the only thing that stopped her was Qato's initiation of this lawsuit and the trial court's issuance of a preliminary injunction. *See* N.T. Trial, 8/28/19, at 209, 216-17.

Despite this foreknowledge of the threat that ALB posed, and Imelda's specific intent to target and transfer AHC clients, Xoxe never told Qato of the existence of ALB or Imelda's plans, or himself took any actions as a director of AHC to retain its clients. *Id*. at 205-14. Xoxe said nothing to Qato because, as he saw it, Qato "didn't pay a penny for that 50 percent of profits." *Id*. at 205.

In April 2017, Qato initiated this action on behalf of AHC against Xoxe, Imelda, and ALB. As indicated above, Qato succeeded in obtaining a preliminary injunction against Imelda's further solicitation of AHC's clients. AHC stated claims of breach of fiduciary duty against Xoxe, aiding and abetting the breach by Imelda and ALB, and civil conspiracy against Xoxe and Imelda. Xoxe filed counterclaims for breach of fiduciary duty, unjust enrichment, and corporate dissolution.

In August 2019, the trial court held a bench trial during which it received evidence of the above facts, as well as evidence that AHC sustained damages totaling $1,333,505.00 as the result of ALB's poaching of clients. After entertaining further written submissions, on June 22, 2020, the trial court filed a verdict indicating that: (1) it found in favor of the plaintiffs and against Xoxe in the amount of $566,752.50, which was half of the damages claimed by the plaintiffs, to be paid directly to AHC; and (2) Xoxe was to be removed as a director, but not as an officer, of AHC.[2]  **See** Order, 6/22/20.

Qato and Xoxe each filed timely post-trial motions. For reasons not apparent from the certified record, the trial court did not rule upon the motions within 120 days, although it entertained other filings in the case. Accordingly, Qato filed a praecipe for entry of judgment pursuant to Pa.R.C.P. 227.4(1)(b). Xoxe filed a timely notice of appeal from the judgment, and Qato filed a timely cross-appeal. Qato *sua sponte* filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, and Xoxe timely complied with a subsequent order to file his statement. Thereafter, the trial court filed a Pa.R.A.P. 1925(a) opinion addressing the parties' claims of error.[3]

_____

[2]  The trial court held that the claims for civil conspiracy and aiding and abetting failed. As Qato and AHC do not argue any claims of error regarding these rulings, Imelda and ALB have declined to participate in these appeals.

[3]  As is discussed *infra*, the trial court acknowledged in its opinion that several of the parties' claims are valid and asks this Court to correct them. **See** Trial Court Opinion, 2/19/21, at 15-16, 18. While we appreciate the candid
*(Footnote Continued Next Page)*

The parties filed their briefs and presented oral argument to this Court. Accordingly, the appeal is ripe for disposition.

Qato presents the following questions for our consideration:

> 1. Did the trial court err in failing to direct that the damages assessed against Petraq Xoxe be awarded directly to plaintiff Eraldo Qato, the 50% shareholder who brought the derivative action, or alternatively, whether the [c]ourt erred in failing to assess damages against Petraq Xoxe in the total amount of the harm he caused to the corporation?
>
> 2. Did the trial court abuse its discretion by failing to provide for the payment of prejudgment interest on the damages award from July 21, 2017 until the date of entry of the final judgment?
>
> 3. Did the trial court err in failing to remove Petraq Xoxe as an officer of [AHC]?

Qato's brief at 3-4.

Xoxe submits the following questions:

> 1. Did the trial court err by finding that [Xoxe] breached his fiduciary duty by: (a) "permitting" his wife to open a business; (b) not stopping clients from leaving to go to his wife's business; and (c) not disclosing the wife's business to a 50% shareholder of the corporation?
>
> 2. Did the trial court err by finding that [Xoxe] was liable for damages for the alleged breach of fiduciary duty where: (a) there was no record evidence that the corporation could have prevented the customers from leaving; (b) the 50% shareholder knew about the competitor despite the non-disclosure; and (c) Pennsylvania's health-care law prohibited the corporation from "influencing" its clients' choice of which healthcare provider to use?

---

admission of error, we observe that the point of post-trial motions practice is to allow the trial court to correct such errors prior to appeal.

> 3. Did the trial court err by removing [Xoxe's] directorship?
>
> 4. Did the trial court err in calculating damages because it relied on an expert report that: (a) stated that 36 customers left the corporation when in fact 33 did so; and (b) failed to consider the corporation's obligation to pay the employer's share of payroll taxes in calculating the corporation's profit margin?

Xoxe's brief at 5-6.

We consider the parties' issues mindful of the following overriding legal

principles:

> Our standard of review of a non-jury verdict is limited to determining whether the findings of the trial court are supported by competent evidence and whether the trial court committed an error in any application of the law. We consider the evidence in a light most favorable to the verdict winner and will reverse only if the trial court's findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*Hornberger v. Dave Gutelius Excavating, Inc.*, 176 A.3d 939, 943–44

(Pa.Super. 2017) (cleaned up).

Rather than addressing each cross-appellant's claims of error *seriatim*,

we group them by subject matter, first considering Xoxe's challenges to the

finding of liability for breach of a duty owed to AHC. Pursuant to

Pennsylvania's Associations Code:

> A director of a business corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director . . . in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances

15 Pa.C.S. § 1712(a). Xoxe acknowledges that he was a director, and thus, a fiduciary, of AHC. **See** Xoxe's brief at 36.

The trial court offered the following basis for its determination that Xoxe breached his fiduciary duties:

> Here, at the very minimum, Xoxe did not act as a person of ordinary prudence would have in warding off competition from ALB. When ALB was draining AHC's client base, Xoxe did nothing to battle AHC's corporate foe. Instead, Xoxe concealed the existence of this new competitor from his corporation. Xoxe also permitted his wife, Imelda, to use their joint marital funds to establish ALB as a corporation and to fund ALB corporate offices. Finally, in response to the new threat, Xoxe stopped working with his business partner and provided no more assistance to the faltering AHC. This amounts to a breach of the fiduciary duty of care.
>
> The precise circumstances further cast aspersions on whether Xoxe displayed the necessary loyalty to AHC that Pennsylvania law prescribes to officers and directors. For one, Xoxe's close relationship with his competitor leads to an inference that his loyalty was not wholly with AHC and Qato. With Xoxe and Imelda sharing a joint bank account, Xoxe's personal wealth would be increased by Imelda's operations, suggesting he placed his own wealth over the best interests of AHC. Xoxe's implied assertion— that he exercised [the required skill and diligence] in his dealings with AHC and Qato—failed to persuade this court. To remark that Xoxe used his personal position—sharing a financial unity with his company's competitor—to the detriment of his differently-suited AHC co-owner is a fair characterization. This court declined to find that Xoxe affirmatively sabotaged AHC, but Xoxe's sundered allegiances and his subsequent suspect conduct constituted a breach of fiduciary duty.

Trial Court Opinion, 2/19/21, at 9-10 (footnotes omitted; party designations altered).

Xoxe argues that the trial court erred in relying upon Xoxe's failure to act as a basis for finding a breach because it improperly raised that theory of

liability *sua sponte*, and because imposition of such a duty is contrary to regulations governing home-healthcare providers. ***See*** Xoxe's brief at 30-32. Xoxe further maintains that the trial court erred in basing its finding of a breach of duty upon a notion that Xoxe was required to control his wife or order her not to compete with AHC. ***Id***. at 34-36. Finally, Xoxe contends that his failure to disclose the existence of ALB could not serve as a breach of duty because he had no obligation to do so. We find merit in none of these arguments.

First, Xoxe did not raise in his post-trial motion or his Pa.R.A.P. 1925(b) statement any claim of error regarding the alleged *sua sponte* injection of a new theory of liability by the trial court, or a complaint that Qato did not plead inaction as a basis for his claim. Accordingly, the issue is waived. ***See*** Pa.R.C.P. 227.1(b)(2) (stating grounds for post-trial relief not specified in the motion are waived); Pa.R.A.P. 1925(b)(4)(vii) (providing issues not raised in a Rule 1925(b) statement are waived). In any event, Xoxe's contention that he was "not on notice that Qato was challenging [Xoxe's] alleged failure to do more to prevent clients from leaving" lacks merit. ***See*** Xoxe's amended fourth-step brief at 3. As Qato details in his brief, inaction as a basis for breach of fiduciary duty appeared as early as at the preliminary injunction stage of the case, was addressed in Qato's pretrial memorandum, and was

litigated at trial. *See* Qato's third-step brief at 3-8.[4] Hence, this issue does not undermine the trial court's finding that Xoxe breached his fiduciary duty to AHC.

Second, the then-applicable provisions of Chapter 51 of the Pennsylvania Code did not prohibit Xoxe from taking any actions to retain clients. Xoxe bases his contention on 55 Pa. Code § 55.11(i), which provided among the prerequisites for becoming a provider enrolled with the Department of Human Services, that a provider "may not influence a participant's freedom of choice in selecting a new provider." 55 Pa. Code § 55.11(i) (effective June 9, 2012 to February 2, 2020).

The trial court agreed that Xoxe could not have forced AHC clients to stay, but it indicated that AHC was permitted to attempt to persuade them to remain. *See* Trial Court Opinion, 2/19/21, at 12. However, Xoxe contends that persuasion "is comparable to 'influence,' or perhaps represents even stronger efforts to alter a decision." Xoxe's brief at 50. He maintains that § 55.11(i) thus mandated his nonfeasance and, therefore, the trial court erred in finding him at fault for his failure to act. *Id*. at 49-51.

We disagree. The plain intent of the then-operable regulation was to prohibit providers from interfering in a client's **freedom** to choose a new

---

[4] Although the terminology "third-step brief" and "fourth-step brief" are not utilized in Pa.R.A.P. 2136 in prescribing the briefing in cross-appeals, we designate them as such herein as the parties have so titled their filings.

- 11 -

provider. It does not preclude a provider from making efforts to retain clients so long as the efforts do not cause the clients to believe that they lacked the freedom to go elsewhere. As Qato observes, § 55.11(i) was "not intended to permit one provider access to the client while denying another provider, the existing provider, from the same access." Qato's third-step brief at 25. Rather, the intent is to forbid a provider "from misrepresenting to the client the fact [that] his or her freedom of choice" is what ultimately controls. *Id*. The trial court did not err in concluding that Xoxe could have, but utterly failed to, make lawful efforts to keep AHC's clients.[5]

Third, we reject Xoxe's suggestion that the trial court's finding was based upon the abolished doctrine of coverture and its tenet that a wife's identity merges into that of her husband. *See* Xoxe's brief at 34-36. Xoxe's argument is that the trial court's reference to Xoxe's willingness for Imelda to use funds from a joint account to fund her competing business necessarily implies "that Imelda had no right to open her own business." *Id*. at 34. In actuality, the trial court merely cited Xoxe's personal financial interest in his

_____

[5] Xoxe alternatively asks that we remand for the trial court to consider the business judgment rule as a basis to preclude his liability. *See* Xoxe's brief at 33. However, that rule "insulates an officer or director of a corporation from liability for a business decision made in good faith" if certain conditions are met. *Linde v. Linde*, 220 A.3d 1119, 1143 (Pa.Super. 2019) (cleaned up). The trial court's implicit finding that Xoxe did not act in good faith, having actively concealed his knowledge and preventing AHC and Qato from taking efforts to thwart Imelda's plans, renders the business judgment rule unavailing under these circumstances.

competitor's success as one of the circumstances evincing his lack of loyalty to AHC and its financial best interests. ***See*** Trial Court Opinion, 2/19/21, at 9-10.

Finally, we are not persuaded by Xoxe's argument that he violated no fiduciary duty because he had no obligation to disclose the existence of ALB. Xoxe highlights that ALB was actually formed when Xoxe was the only shareholder of AHC, thus giving him no one else to whom to disclose the information. However, this straw-man argument is meritless. We reiterate that the trial court did not find Xoxe liable for a mere failure to disclose the fact that ALB existed. Rather, the trial court found that Xoxe actively concealed his wife's scheme to lure away AHC's clients, made no effort in his role as an officer and director of AHC to retain its clients, and indeed stopped performing the normal work he had done for AHC before ALB's recruitment campaign began. ***See*** Trial Court Opinion, 2/19/21, at 9. Moreover, since Xoxe and Imelda did not maintain separate finances, Xoxe personally benefitted from his decision to ensure that AHC took no steps to compete with ALB. Xoxe's attempt to set up an overly-narrow basis for the trial court's decision merely to knock it down does not persuade us that relief is due.

Accordingly, we conclude that none of Xoxe's claims of error concerning the trial court's finding that he breached his fiduciary merits relief.

In his next cluster of issues, Xoxe asserts that the trial court erred in finding that his breach of duty caused damages. Specifically, Xoxe contends

that his inaction was not the proven cause of any losses sustained by AHC since there was no evidence showing: (1) why any of the clients left AHC, (2) that Xoxe or AHC could have prevented any clients from leaving for ALB, and (3) what Qato would have done differently if Xoxe had disclosed Imelda's efforts.[6] *See* Xoxe's brief at 44-48.

We find our decision in *CST, Inc. v. Mark*, 520 A.2d 469 (Pa.Super. 1987), to be instructive. CST was an advertising firm, and Mark its vice president of media operations. Mark had been involved in CST's publication of a 1981 trip planning guide for a client. Although Mark had attempted to convince CST to take the necessary steps to seek the job of publishing the 1982 guide, CST was reluctant, citing a cash-flow problem. Mark personally obtained the job in the name of his own company and fronted $5,000 to the client. CST later met with the client, which requested that Mark release his rights to the job. However, by the time this came about, CST was not able to post the required performance bond and did not publish the 1982 guide. CST terminated Mark and sued him for breach of fiduciary duty.

The trial court found Mark liable for breaching his fiduciary duty of undivided loyalty and awarded $40,000 in damages. Specially, the court found that Mark had not been unjustly enriched by usurping the opportunity,

---

[6] Xoxe also relies upon the regulations against influencing the clients' freedom to choose another provider in challenging the damages awarded by the trial court. *See* Xoxe's brief at 49-51. This claim fails for the reasons explained *supra* in connection with Xoxe's breach of his fiduciary duty.

as he lost the $5,000 of his personal money and released his interest in the contract. However, the court found that Mark's breach of fiduciary duty "had been a substantial factor in bringing about, and, therefore, a legal cause of the corporation's failure to get the contract." *Id*. at 472. It therefore awarded damages "measured by the court's estimate of the profits which the corporation had lost by not getting the job." *Id*.

On appeal, Mark contended, *inter alia*, (1) that the evidence was insufficient to establish that his actions were the cause of CST's failure to obtain the contract or (2) that the profits would have been $40,000. *Id*. at 473. This Court disposed of the claims as follows:

> These are close questions. However, when a Pennsylvania appellate court reviews determinations of questions of fact, its only function is to examine and ascertain whether there is competent evidence in the record from which the facts necessary to sustain the judgment might properly be found. The test is not what conclusion the appellate court would have reached if it had been its province to find the facts, but whether there was evidence from which the facts could reasonably be found.
>
> Because our scope of review is thus limited, we are constrained to accept the findings of the trial court. Although the evidence would have supported contrary findings, we cannot say that the trial court arbitrarily rejected evidence or abused its discretion when it concluded that except for appellant's breach of the duty of undivided loyalty to the corporation, CST would have been hired to produce the [1982] guide and would have realized therefrom a profit of $40,000.00.

*Id*. (cleaned up).

Applying this rationale to the case *sub judice*, we reach the same result. Qato did not produce witnesses to indicate that each of the thirty-three clients

who left within the two-week period in 2017 would have stayed with AHC if Qato had foreknowledge of Imelda's plans or Xoxe had taken steps to retain their business. However, as detailed above, the court did hear that AHC had no complaints from clients prior to that time, that many expressed confusion afterwards about the fact that they were now with a different company, and that the mass exodus of clients ceased once Imelda was precluded from soliciting from AHC's client base. Therefore, we cannot say that the trial court abused its discretion in inferring from the evidence presented that the clients would have stayed but for Xoxe's malfeasance. No relief is due.

Having concluded that the trial court acted within its discretion in finding a breach of duty and causation, we next consider the parties' challenges to the amount of damages assessed by the trial court. The trial court awarded half of the amount of damages calculated by Qato's expert to be paid by Xoxe to AHC. Plaintiffs contend that the trial court, finding for the corporation on the derivative action, should have awarded 100% of the damages to be paid to the corporation, rather than the 50% loss suffered by Qato individually. *See* Qato's brief at 12-15. Xoxe argues that the trial court's calculation was incorrect because it was based upon an expert report that (1) included more customers leaving than was supported by the evidence, and (2) did not factor taxes into the calculation. *See* Xoxe's brief at 54-56.

The trial court acknowledged that it committed two of the three errors alleged. Regarding Xoxe's claim about the number of customers, the trial

- 16 -

court suggests that this Court "account for the discrepancy by reducing the damages found in Qato's expert report by 8.33% or three divided by thirty-six." Trial Court Opinion, 2/19/21, at 16. As for Qato's claim about the erroneous halving of damages, which Xoxe agrees requires correction, the trial court indicates that the correct damages amount should be $1,039,046.25, which is the full, adjusted amount of lost profits sustained by AHC. *See* Xoxe's brief at 28; Trial Court Opinion, 2/19/21, at 18.

However, the trial court denies any miscalculation involving the FICA and unemployment compensation taxes. It expressed the understanding "that these taxes would be assessed on [the] damage award after the distribution to the shareholders." Trial Court Opinion, 2/19/21, at 16. The court explained: "If this is true, accounting for the unemployment and FICA taxes in [the] damage award to AHC would lead to what is essentially double taxation." *Id*. The trial court thus declined to deduct these taxes, believing that "AHC's damage award will presumably be taxed by FICA and unemployment after distribution." *Id*.

We conclude that the trial court erred in all three respects in formulating its damages award. As Xoxe explained, FICA and unemployment payroll taxes are paid in part by an employee on their wages and are generally withheld by the employer. *See* Xoxe's brief at 55. However, the employer has its own, separate obligation to pay payroll taxes. *Id*. While Xoxe's expert factored this business expense into the calculation of AHC's net profits, Qato's did not.

*Id*. Xoxe maintains that, applying the expense of payroll taxes to the calculations of Qato's expert, AHC's profit margin is 28.06%, not 34.1. *Id*. Notably, Qato does not offer any argument in support of the trial court as to this issue. Hence, we agree with Xoxe that the trial court's calculation was further in error based upon its misapprehension of the nature of payroll taxes as a business expense of AHC which AHC would not have retained as profit.

Accordingly, we vacate the judgment and that portion of the verdict ordering Xoxe to pay $566,752.50 to AHC. We further reverse the denial of Qato's post-trial motion as to issue (A)(1) and Xoxe's post-trial motion as to issue (III). Upon remand, the trial court shall enter a new verdict reflecting the damages of lost **net** profits from the thirty-three lost customers, and it shall order that either 100% of the damages be paid by Xoxe to AHC, or 50% of the damages paid directly to Qato.[7]

Next, Xoxe argues that the trial court erred in removing him as a director of AHC, while Qato asserts that it erred in not also removing him as an officer. Our legislature has provided that directors of a corporation may be removed

---

[7] Qato suggests that the trial court could have, and should have, instead awarded 50% of AHC's damages directly to Qato. **See** Qato's brief at 16-17. Xoxe, noting that the parties are in new litigation concerning control over AHC, agrees that ordering Xoxe to pay half of the corrected damages amount directly to Qato would be the most practicable solution. **See** Xoxe's brief at 57-58. We leave the question to the trial court to decide when entering its amended verdict.

by shareholders, the board, or the court. Specifically, the following applies to court removal of a director:

> Upon application of any shareholder or director, the court may remove from office any director in case of fraudulent or dishonest acts, or gross abuse of authority or discretion with reference to the corporation, or for any other proper cause, and may bar from office any director so removed for a period prescribed by the court. The corporation shall be made a party to the action and as a prerequisite to the maintenance of an action under this subsection a shareholder shall comply with Subchapter F (relating to derivative actions).

15 Pa.C.S. § 1726(c). This decision is within the sound discretion of the trial court. *See **Linde v. Linde***, 220 A.3d 1119, 1145 (Pa.Super. 2019).

As for officers, the Associations Code merely provides that "[a]ny officer or agent of a business corporation may be removed by the board of directors with or without cause." 15 Pa.C.S. § 1733.

The trial court addressed Xoxe's claim of error as follows:

> Here, th[e trial] court found that Xoxe actively concealed Imelda's business scheme from AHC, failed to notify Qato of this approaching business adversary, and spent increasingly less time working for AHC when his wife Imelda began targeting AHC customers. Th[e c]ourt finds this behavior exhibited a lack of trust and honesty. Similarly, Xoxe's concealment of Imelda's plot suggested a lack of integrity. Further, Xoxe's failure to notify his corporation of a potential business threat that could potentially usurp all of ANC's clients constituted a gross abuse of discretion. All in all, Xoxe committed the necessary acts to reach the offending level of conduct required for director removal.

Trial Court Opinion, 2/19/21, at 13-14 (party designations altered).

Xoxe's argument for reversal is primarily a regurgitation of his belief that it was a mere failure to tell Qato that ALB existed that formed the basis

of the trial court's ruling, and that it was in error because he had no duty to do so. *See* Xoxe's brief at 51-52. We have already rejected Xoxe's mischaracterization of the trial court's holding, finding ample evidence that he breached his duty to AHC by both assisting Imelda in forming ALB with the full knowledge that she did so for the specific purpose of decimating AHC's business and by ensuring that AHC would offer no resistance to her efforts. The trial court did not err in finding this proper cause to remove Xoxe as a director of AHC pursuant to § 1726(c).

As for Qato's claim, the trial court opined that it lacked the authority to remove corporate officers. *Id*. at 19. Qato offers no support for a trial court's power to remove an officer other than § 1726(c). Qato contends that the statute's reference to a court's power to remove a director "from office" is a reference "to the fact that many corporate directors serve as officers as well." Qato's brief at 22. Therefore, Qato posits, § 1726(c) provides the "statutory authority to remove Petraq Xoxe as an officer of [AHC] for the very same reasons that his removal from the board of directors was warranted." *Id*.

We find Qato's attempt to stretch the reach of § 1726(c) unavailing. The legislature plainly established separate rules for the removal of directors and officers, declining to allow court intervention regarding the latter. *Compare* 15 Pa.C.S. § 1726(c) ("Removal of directors") *with* 15 Pa.C.S. § 1733 ("Removal of officers and agents"). The fact that a directorship is an "office" within the company does not make a director an "officer." AHC is free

to itself, through its new board of directors, which does not include Xoxe, to remove him as an officer with or without cause pursuant to § 1733.

Finally, Qato contends that the trial court erred in failing to award pre-judgment interest. Whether to award prejudgment interest is within the sound discretion of the trial court. **See**, **e.g.**, **Kaiser v. Old Republic Ins. Co.**, 741 A.2d 748, 755 (Pa.Super. 1999).

> When a court comes to a conclusion through the exercise of its discretion, there is a heavy burden to show that this discretion has been abused. It is not sufficient to persuade the appellate court that it might have reached a different conclusion, it is necessary to show an actual abuse of the discretionary power. An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. Absent an abuse of that discretion, we will not disturb the ruling of the trial court.

**Linde**, **supra** at 1150 (cleaned up).

The general rule is that the prevailing litigant is entitled only to interest as of the date of the verdict. **Id**. However, "pre-judgment interest may be awarded when a defendant holds money or property which belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his unjust enrichment. Pre-judgment interest in such cases is a part of the restitution necessary to avoid injustice." **Id**. (quoting **Kaiser**, **supra** at 755) (cleaned up). In sum, the trial court should apply equitable principles and decide whether to award interest "according to a plain and simple consideration of justice and fair dealing." **Id**. (cleaned up).

The trial court, in addressing Qato's claim of error regarding its failure to award pre-judgment interest, acknowledged the legal principles noted above, then explained its decision as follows:

> Here, this [c]ourt used this broad discretion to [deciding whether to] award pre-judgment interest, and this [c]ourt declined to deviate from the general rule that the successful litigant is entitled to interest beginning only on the date of the verdict.
>
> Therefore, this Court did not err in declining to award pre-judgment interest to AHC.

Trial Court Opinion, 2/19/22, at 18.

Qato maintains that an award of prejudgment interest is necessary to fully compensate AHC for Xoxe's breach of fiduciary duty, and urges that "[t]his Court should not countenance" the trial court's non-explanation for its decision to the contrary. Qato's brief at 19.

We agree that the trial court's opinion does not shed much light on its balancing of the equities. However, this Court has in a similar situation affirmed the trial court's ruling where the certified record otherwise indicated that the trial court's decision was based upon the proper considerations. **See Kaiser**, **supra** at 755 (affirming trial court's award of prejudgment interest upon an examination of the evidence of record although "the trial court did not specify its reasons for the award of pre-judgment interest").

As Xoxe observed, the trial court did not find that Xoxe took property belonging to AHC, "but rather failed to do more to stop others from taking it." Xoxe's brief at 58. Further, since the clients went to ALB, of which Imelda

was the only owner, and Qato points to no evidence of how much benefit Xoxe himself has realized, the traditional basis for the award of such interest, namely to disgorge wrongfully-obtained property from one who has been unjustly enriched, is not evident. Hence, we agree with Xoxe that the trial court's decision to award AHC damages for the expected future profits lost from the transfer of all thirty-three clients, but to deny pre-judgment interest, was a reasonable compromise under the circumstances of this case and not a manifest abuse of discretion. **See Kaiser**, **supra** at 755. Consequently, we hold that Qato's final issue merits no relief.

Nonetheless, for the reasons detailed above, we vacate the October 28, 2020 judgment, affirm in part and reverse in part the denial by operation of law of the parties' motions for post-trial relief, and remand for further proceedings consistent with this memorandum.

Judgment vacated. Case remanded with instructions. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/4/2022